**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Juan M. FELICIANO, Defendant–
Appellant.**

No. 94–2395.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 16, 1994.

Decided Jan. 17, 1995.

---

Barry Rand Elden, Asst. U.S. Atty. and Lance Malina (argued), Office of the U.S. Atty. Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

John F. Murphy (argued), Carol A. Brook, and Deane B. Brown, Office of the Federal Defender Program, Chicago, IL, for defendant-appellant.

Before POSNER, Chief Judge, and EASTERBROOK and MANION, Circuit Judges.

POSNER, Chief Judge.

Imaginative police work led to the conviction of Juan Feliciano of being a felon in possession of a gun. He was sentenced as an armed career criminal to 198 months in prison because of his long record of violent crimes. 18 U.S.C. § 924(e). His appeal, which challenges the denial of a motion that he made in the district court to keep the gun out of evidence, 830 F.Supp. 448 (N.D.Ill. 1993), requires us to consider once again the much-litigated issue of the limits that the Fourth Amendment places on the power of the police to make a stop and frisk. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The other issues raised by the appeal do not require discussion.

Officer John Darr of the Elgin, Illinois, police department was patrolling one night in an unmarked police car near the train sta-

tion. Shortly before midnight he noticed three men at the station. One, later identified as Sith Keovilayhong, a college student, was standing near the train tracks, holding a suitcase. The other two, later identified as the defendant (Juan Feliciano) and Sonito Mason, were walking toward the station's parking lot and looking at Keovilayhong. They reached the corner of the lot, which is near an embankment that drops to the Fox River. Their destination struck Darr as odd because there were no cars in that part of the lot. His suspicions aroused, he radioed for assistance. Two officers also patrolling in an unmarked car responded, and Darr described Feliciano and Mason to them. Moments later Darr saw Mason walk over to Keovilayhong, speak to him briefly, then return to Feliciano, whereupon Mason and Feliciano left the area of the station, walking east on Chicago Avenue. Keovilayhong also left the area, walking west on the same street. Darr told his backup officers to keep an eye on Feliciano and Mason while he tried to find out from Keovilayhong what had happened. He caught up with the latter, who told him that he thought the two persons later identified as Mason and Feliciano had been planning to mug him. Mason had asked Keovilayhong to accompany him to the embankment to help an injured friend (Feliciano). Keovilayhong had demurred, having seen Feliciano walk by moments before without any sign of being injured. Mason had then asked Keovilayhong for 50 cents. Keovilayhong had refused, claiming to have no money, and Mason had then left.

Darr told his backup officers to stop and frisk Feliciano and Mason. They did so. One of the officers recognized Feliciano as a gang member who had just been released from prison, where he had been serving time for robbery. The frisk of Feliciano turned up a pistol from which the serial number had been scraped off, and the frisk of Mason turned up a meat cleaver and a folding knife, together with marijuana. (Mason was later charged with illegal possession of drugs and with a battery that he committed on a police officer shortly after the stop, when the police arrested him. These were state law charges, and we have not been informed of their disposition.) When they were stopped, both of the suspects were (it was later discovered) walking in the general direction of their homes.

A person may be stopped for brief questioning and a pat-down search if, even though the police do not have probable cause to believe that he has committed or is in the course of committing or about to commit a crime, and therefore could not lawfully arrest him, they have an articulable suspicion (more precisely, or at least elaborately, "a reasonable suspicion supported by articulable facts") that any of these things might be so. E.g., *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994). The requirement that the officers' suspicion be articulable prevents the police from stopping a person on the basis of pure, even if inspired, hunch. *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883. The police must be able to give a rational explanation for why they suspected the person they stopped. This is an important requirement because without it the police could stop people at will, a *carte blanche* that has been thought inconsistent with the limitations that the Fourth Amendment places on the power to search and seize, and even un-American. A stop is not an arrest, but it is a sufficiently intrusive and even humiliating interference with freedom and privacy that it has been deemed to be within the amendment's scope. But the standard must not be set too high, for otherwise, as Judge Zagel explained, "the uncaring time-server who wears a badge will rarely be stirred to stop and frisk anyone," since "it is much easier to sit and just watch even the most suspicious conduct than it is to intervene before it becomes obvious to anyone that a crime is being committed." 830 F.Supp. at 450.

Judge Zagel found that the police had had an articulable suspicion of criminal activity and had therefore been justified in stopping Feliciano; and there is no question that if the stop was lawful so were the frisk, the finding of the gun, and the resulting conviction and sentence. We are bound by the judge's finding unless it is clearly erroneous. *United States v. Ornelas–Ledesma,* 16

F.3d 714, 719 (7th Cir.1994). It is not. We do not buy Feliciano's argument that the conduct that drew Officer Darr's attention was perfectly innocent-appearing, so that Darr's hunch that Feliciano and Mason were criminals was just that, a hunch. Darr did not require articulable suspicion to speak to Keovilayhong, to radio for assistance, or to direct the backup officers to follow Feliciano and Mason; for none of these were acts which infringed, even prima facie, Feliciano's (or Mason's) rights, whether under the Fourth Amendment or anything else. And once Darr had spoken to Keovilayhong, he had an articulable suspicion that Feliciano and Mason had planned to rob the student. Feliciano's lawyer argues that, for aught that appeared to Keovilayhong and Darr, Mason's request that the student accompany him to an injured friend was innocent. The friend was not disabled or even impeded in walking; but he might have had, the lawyer argues, another kind of injury—a cut hand or an infected eye, for example. But why would Mason have asked Keovilayhong to accompany him to a remote corner of the parking lot to examine a friend with a cut hand or an infected eye? There is no suggestion that Keovilayhong looked like a doctor; even if he did, why did not Mason's friend come to him? And why had the injured friend walked to the embankment in the first place? When Keovilayhong refused to accompany Mason, the sequel—Mason's request for 50 cents—had the air of a non sequitur. And when Feliciano and Mason then left and walked east on Chicago Avenue, they gave no impression of being in search of medical assistance.

■ Of course the fact that both men were armed shows that the encounter with Keovilayhong was the opposite of innocent, but a search cannot be justified on the basis of what it turns up. Nevertheless the contention of the defendant's lawyer that his client did nothing "even remotely suspicious" and that to conclude otherwise is to invite "the onset of a police state" carries advocacy to new heights of hyperbole. Darr was entitled to use common sense. *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *United States v. Tipton,* 3 F.3d 1119, 1122 (7th Cir.1993).

A further argument against the lawfulness of the stop, however, is that suspicion that someone has been *planning* a crime is not a basis for a *Terry* stop. If a crime is *about* to be committed, fine. *Terry v. Ohio, supra,* 392 U.S. at 29, 88 S.Ct. at 1884. Likewise if it *has* been committed. *United States v. Hensley,* 469 U.S. 221, 227–29, 105 S.Ct. 675, 679–81, 83 L.Ed.2d 604 (1985). And an interrupted crime may itself be a crime—the crime of attempt. But it is unlikely that Mason's asking Keovilayhong to accompany him to the embankment was a sufficiently definitive step toward the completed crime of robbery to support a prosecution for attempt. *People v. Smith,* 148 Ill.2d 454, 170 Ill.Dec. 644, 648, 593 N.E.2d 533, 537 (1992). Conspiracy is a much stronger possibility. Darr had reason to suspect that Feliciano and Mason had agreed to rob Keovilayhong; Mason's asking Keovilayhong to accompany him to where Feliciano was waiting would be the required overt act in furtherance of the conspiracy. *People v. Ambrose,* 28 Ill.App.3d 627, 329 N.E.2d 11, 14 (1975). The officers also had an articulable suspicion that either Feliciano and Mason, or both, were armed, and—since few people are authorized to carry concealed weapons—armed illegally.

The officers were independently justified, moreover, in stopping Feliciano and Mason on suspicion that they might try to rob some other hapless passerby. It is true that they were walking toward their homes and that by this time the downtown area of Elgin, where the station was located, was deserted except for Keovilayhong, and he was walking in the opposite direction. But the officers could not have any confidence that Feliciano and Mason were finished with crime for the night. They were walking toward a residential area and might encounter a pedestrian; even in Elgin, not everyone is in bed or even at home by midnight. Feliciano and Mason apparently had tried and failed to rob one person, and should they chance on another the probability of a repetition could not be reckoned trivial.

Feliciano argues that even if there is an articulable suspicion that the person stopped is en route to the commission of a crime, he

may not be stopped if the crime is not expected to occur within a few minutes. Any greater interval causes the justification for the stop to "evaporate," as we put it in one case. *United States v. Posey,* 663 F.2d 37, 41 (7th Cir.1981). Our more recent cases cast considerable doubt on the existence, or at least scope, of an "evaporation" doctrine; for they do not cite *Posey,* or refer to such a doctrine, even though they involve intervals of hours. *United States v. Tilmon, supra,* 19 F.3d at 1225 (two hours); *United States v. Boden,* 854 F.2d 983, 986, 992 (7th Cir.1988) (one hour and 25 minutes); *United States v. Longmire,* 761 F.2d 411, 413–14 (7th Cir. 1985) (almost five hours); *Thomas v. Newsome,* 821 F.2d 1550, 1552–53 and n. 3 (11th Cir.1987) (about six hours); *Creighton v. Anderson,* 922 F.2d 443, 450 (8th Cir.1990) (hour and ten minutes). *Terry* itself involved an open time frame. The suspects had cased one store, and were in front of another when they were stopped. It was unclear whether they meant to rob the second store forthwith or to return at nightfall and hit both. It did not matter; the stop was lawful. And in *Pliska v. City of Stevens Point,* 823 F.2d 1168, 1174–78 (7th Cir.1987), the suspect was stopped in mid-afternoon on suspicion that he was casing homes to burglarize at some indefinite time in the future; nevertheless the lawfulness of the stop was upheld.

The metaphor of evaporation is not a happy one: Water evaporates at a more or less constant rate (holding temperature constant); suspicion does not. The metaphor may not even help defendants, for a stop is not proper if the suspicion on which it is founded is dispelled at any time before the stop takes place, *United States v. McSwain,* 29 F.3d 558, 561 (10th Cir.1994); *United States v. Peters,* 10 F.3d 1517, 1522 (10th Cir.1993); *United States v. Watts,* 7 F.3d 122, 126 (8th Cir.1993), even if no time has passed since the suspicion was formed: a case of instant evaporation. Yet in defense of *Posey*—not of its formula or metaphor, but of its animating idea—it can be argued that an articulable suspicion of a crime to be committed in the distant future would not justify a stop. The long incubation period of the crime would both attenuate the probability that the crime would actually be committed and give the police ample time by further investigation to obtain a better "fix" on that probability. The difficult question is what is "distant" for these purposes. We need not try to answer it here. The probability that Feliciano and Mason would mug someone before they went home, which is to say within minutes or at most a few hours, was sufficient under *Terry* to justify the stop. See 392 U.S. at 28, 88 S.Ct. at 1883. And this is quite apart from the probability that they had already committed the crime of conspiracy to rob, or were committing the continuing crime of carrying concealed weapons illegally.

■ We have said nothing about what might appear to be the clincher of the government's case—the fact that one of the officers who stopped Feliciano recognized him as a gang member recently released from prison where he had been serving a term for robbery. Knowledge of gang association and recent relevant criminal conduct, while of doubtful *evidentiary* value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a *Terry* stop. *United States v. Boden, supra,* 854 F.2d at 992; *United States v. Wheeler,* 800 F.2d 100, 103–04 (7th Cir.1986), overruled in part on other grounds by *United States v. Sblendorio,* 830 F.2d 1382, 1393 (7th Cir.1987); *United States v. Chhunn,* 11 F.3d 107, 110 (8th Cir.1993); *United States v. Campbell,* 942 F.2d 890, 892 (5th Cir.1991).

The officer's knowledge might be thought irrelevant because before he recognized Feliciano he had been ordered by Darr to make the stop, and Darr was unaware of Feliciano's identity; therefore there was no causal connection between the knowledge and the stop. Had the officers known nothing that Darr knew—had they been acting solely in response to his order—their ignorance would not have invalidated the stop. *United States v. Hensley, supra,* 469 U.S. at 229–33, 105 S.Ct. at 680–83; *Gordon v. Degelmann,* 29 F.3d 295, 300 (7th Cir.1994); *United States v. Nafzger,* 974 F.2d 906, 912–15 (7th Cir.1992). But Feliciano argues that, precisely because these officers were executing the order of another person, their knowledge cannot be

used to satisfy the requirements of *Terry* because it was not linked causally to the stops.

The argument misunderstands the complex concept of "cause." What is true is that the officer's knowledge was not a "but for" cause, a necessary condition, of the stop; the stop would have taken place even if he had not recognized Feliciano. A "but for" cause is only one kind of cause, however; in fact it often is not deemed a cause at all. A person is summoned to his boss's office to be fired; on his way out he trips over a banana peel and is injured. The injury would not have occurred had he not been fired. But he cannot collect damages for the injury on the ground that it was "caused" by the firing. The injury was not caused by the firing in the relevant sense of "caused." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, at 911 (7th Cir.1994). Just as a "but for" cause need not be a cause, at least a cause of which the law takes cognizance, so an antecedent event that is not a "but for" cause may be treated as a cause. A barrel of gasoline is sitting on the street. Through negligence two people toss lighted matches into the barrel at the same time and it explodes. It would have exploded if only one lighted match had been thrown into it; so neither person was a "but for" cause of the explosion; yet both would be held liable in tort (or criminally if they had acted recklessly or deliberately), both having "caused" the explosion in a perfectly reasonable sense. See, e.g., *Kingston v. Chicago & N.W. Ry.*, 191 Wis. 610, 211 N.W. 913 (1927); *DePaepe v. General Motors Corp.*, 33 F.3d 737, 741 n. 7 (7th Cir.1994); *Bosco v. Serhant*, 836 F.2d 271, 280 (7th Cir.1987). And so it is here. Had Darr merely told the other officer of his suspicions, without directing him to stop Feliciano, the officer upon recognizing Feliciano would almost certainly have stopped him, and if so the recognition played as significant a causal role in the stop as Darr's order. We do not see why it should not be available to support the stop. Cf. *United States v. Edwards*, 885 F.2d 377, 382–83 (7th Cir.1989).

Judge Zagel's decision not only was not clearly erroneous; it strikes us as clearly correct. And we think that Officer Darr should be commended for the alert and intelligent—and constitutional—discharge of his duties, as a result of which a violent career criminal was taken out of circulation.

AFFIRMED.