# United States Court of Appeals
## For the First Circuit

No. 05-2283

UNITED STATES OF AMERICA,

Appellant,

v.

AMANDO B. MONTEIRO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,
and Saylor,* District Judge.

Theodor B. Heinrich, Assistant United States Attorney, with
whom Virginia M. Vander Jagt, Assistant United States Attorney,
and Michael J. Sullivan, United States Attorney, were on brief,
for the United States.
Kevin S. Nixon for the defendant.

May 5, 2006

_____
* Of the District of Massachusetts, sitting by designation.

**LIPEZ**, <u>Circuit Judge</u>.  Acting on Amando Monteiro's pretrial motion, the district court suppressed from evidence two guns the police obtained during a vehicle stop.  The government sought our review pursuant to 18 U.S.C § 1371, which authorizes interlocutory appeals in situations such as this.  We affirm.

## I.

In an appeal from a suppression order, the district court's findings of fact govern absent a showing of clear error.  <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690, 699 (1996).  Neither party suggests that the district court made such an error, so we recite the facts as the district court found them.  We also add a few undisputed details from the record.

Shortly after 4:00 P.M. on March 25, 1999, Boston police responded to reports of gunfire on Eastman Street, in the Dorchester section of the city.  The target of the shooting, who escaped unharmed, was Antonio Cabral.  The police knew that Cabral was associated with a gang and that his gang and its rival had been involved in a series of shootings.  At the scene on Eastman Street, patrol officers James Coyne and Thomas Griffiths spoke with Cabral for about an hour.  Cabral reported that two men had shot at him through a fence, while he was standing in his driveway.  Cabral said he had no knowledge of the identity of the shooters, but another person who had been nearby told the police that a red Mazda had raced away from Eastman Street shortly after the shooting.

-2-

At around 8:00 P.M. that evening, Coyne and Griffiths returned to Eastman Street and interviewed Cabral again. This time, Cabral's mother and brother were present. Cabral again said he had no information for the police. The Cabrals complained that the police "weren't doing enough in the community to stop the violence." Coyne responded that the police could do more if neighborhood residents would "give us information for us to solve these shootings." Cabral then said that he had no information to offer about his own shooting but that he had information about another shooting that same day. Cabral said that a relative told him that she had witnessed gunfire on Shirley Street from two cars, a red Mazda and a red Honda with license plate 5021EV. Coyne asked Cabral who the relative was. Coyne understood Cabral to indicate that the relative was female, but Cabral refused to give her name or any other information about her. The police made no further attempts to identify or locate the unnamed relative.

That same evening, Coyne and Griffiths drove to Shirley Street and looked for some evidence of gunfire, such as spent shell casings or bullet damage. They found none. The officers also searched the police department's records to see if anybody had reported gunfire on Shirley Street. No one had. Coyne later testified at the suppression hearing that it was typical for

shootings in the neighborhood to be reported to 911, and for obvious evidence of gunfire to be found at the scene.[1]

Coyne ran the 5021EV license plate number through the vehicle registration database and matched the plates to a red Honda belonging to Marcelino Rodrigues. Coyne was familiar with Rodrigues and suspected that he was affiliated with a gang that was a rival to Cabral's. Coyne also knew that Rodrigues had been arrested three weeks earlier in Randolph, Massachusetts, on a firearms possession charge.[2] Coyne and Griffiths went to the address Rodrigues had listed on his vehicle registration, but Rodrigues was not there. That night, the officers looked for Rodrigues around the neighborhood but did not find him. Coyne and Griffiths radioed other officers in the area to be on the lookout for Rodrigues and the red Honda, but no one saw Rodrigues or his car.

A full week passed during which the police apparently conducted no further investigation of the possible shooting on Shirley Street. Then, on March 31st, Coyne, Griffiths, and a third

_____

[1] Specifically, Coyne testified that after shootings in the neighborhood:

> There would be parties outside. There would be numerous 911 calls. . . . You'd get to the scene. There would be cars, multiple cars shot up, ballistics damage in the street.

[2] The charges against Rodrigues from the Randolph arrest eventually were dismissed.

officer were conducting a traffic stop when they saw Rodrigues and two passengers drive by. The officers rushed to their cars, pursued Rodrigues, and pulled him over for "field interrogation and observation."[3] There was no traffic violation or suspicious activity. The defendant was one of Rodrigues's passengers.

Although this appeal is limited to the legality of the initial vehicle stop, we relate briefly what happened thereafter. The officers ordered Rodrigues and his passengers to step out of the car. The third officer, who was not available to testify at the suppression hearing, told Coyne that he had seen a gun in the center console of the car.[4] The police then handcuffed Rodrigues and his passengers and, upon obtaining a search warrant, searched the car and recovered two guns. These guns comprise the evidence at issue in this appeal. At the scene, the police questioned Rodrigues about the purported Shirley Street shooting and about the attempted shooting of Cabral on Eastman Street. Rodrigues denied involvement in either event.[5]

---

[3] We quote this phrase, which appears to be a term of art in the Boston Police Department, from Officer Coyne's testimony at the suppression hearing. Coyne explained that he meant that he had stopped Rodrigues's car to "get information" by "speaking to [the driver]."

[4] At least one of the police officers had seen Rodrigues leaning towards the center of his car as the police pulled him over, after the stop was initiated (the government does not rely on this evidence in arguing for the legality of the initial stop).

[5] Later, after agreeing to cooperate with the government, Rodrigues testified at the suppression hearing that he had indeed

Subsequently, the state and federal governments indicted the defendant on a variety of charges. In both prosecutions, the defendant sought to suppress evidence gathered in connection with the March 31st stop of Rodrigues's car.[6] The district court held a two-day evidentiary hearing and issued a thoughtful order. The court concluded: "While this is a borderline case, once the tip [of a shooting on Shirley Street] proved to be unreliable, the hunch [that Rodrigues was involved in criminal activity] was not enough to establish a reasonable and articulable suspicion of criminal activity sufficient to stop the red Honda."

**II.**

The sole question in this interlocutory appeal is whether the police acted reasonably in stopping Rodrigues and his passengers on March 31st. Because only the district court's ultimate Fourth Amendment conclusion is at issue, our review is de novo. United States v. Paradis, 351 F.3d 21, 24 (1st Cir. 2003).

When a police officer makes "brief investigatory stops of persons and vehicles that fall short of traditional arrest . . . the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion that criminal activity may be

_____

been involved in the attempted shooting of Cabral. Rodrigues also testified that there had been no shooting on Shirley Street on March 25th.

[6] The state court also granted the defendant's motion to suppress.

-6-

afoot," United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted), or if there is "reasonable suspicion, grounded in specific and articulable facts, that [the stopped] person . . . was involved in or is wanted in connection with a completed felony," United States v. Hensley, 469 U.S. 221, 229 (1985). In evaluating whether reasonable suspicion existed, we "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (internal quotation marks omitted). The government bears the burden of showing such a basis. See Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion); Brown v. Texas, 443 U.S. 47, 52 (1979). We allow police officers "to draw on their own experience and specialized training" in making a vehicle stop. Arvizu, 534 U.S. at 273. But the reasonable suspicion standard imposes meaningful limits on temporary detentions. "[A]n officer's reliance on a mere 'hunch' is insufficient to justify a stop." Id. at 274 (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)).

While the defendant was neither the driver of the vehicle stopped on March 31st nor then the subject of police suspicion, he was seized when the police stopped Rodrigues's car. Consequently, he has the right to contest the legality of that stop. See United States v. Woodrum, 202 F.3d 1, 5-6 (1st Cir. 2000).

The government contends that the totality of the circumstances known to the police provided adequate justification for the March 31st vehicle stop. In its briefs, the government suggests that the police may have suspected Rodrigues of three types of wrongdoing: the purported shooting on Shirley Street; the attempted shooting of Cabral on Eastman Street; and ongoing involvement in what the government terms "gang warfare." However, the government conceded at oral argument that there is "no" information in the record tying Rodrigues or his car to "involvement in the Eastman Street shooting." (Coyne had said essentially the same while testifying at the suppression hearing.) Furthermore, while the police suspected Rodrigues of being a gang member, the government does not contend that there was any reason to suspect that Rodrigues and his passengers were involved in criminal activity when the stop took place on March 31st, or that they were about to be so involved.

The government does argue that the police had a reasonable suspicion, grounded in specific and articulable facts, that Rodrigues had committed a crime on Shirley Street on March 25th. (Coyne testified that investigation of this purported crime was his actual motivation in stopping the Honda on March 31st.)[7]

---

[7] Of course, reasonable suspicion is an "objective legal standard," Ornelas, 517 U.S. at 701, and does not "depend[] on the actual motivations of the individual officers involved," Whren v.

The tip from Cabral's unidentified relative is the focus of the government's argument. Therefore, in section A, we evaluate the appropriate place in the reasonable suspicion analysis i) of that tip and ii) of the factors that the government argues corroborated it. We conclude that the minimally corroborated tip did not alone provide reasonable suspicion for a vehicle stop on March 31st. In section B, we consider the tip and its minimal corroboration with the other information known to the police on March 31st. We conclude that the totality of the circumstances, including the tip, did not provide reasonable suspicion to stop the car on March 31st.

## A. The Tip From Cabral's Relative

The only indication that a shooting actually had occurred on Shirley Street was the hearsay statement of Cabral's unnamed relative, as relayed to the police by Cabral. Three Supreme Court cases provide the basic parameters for determining whether an informant's tip provides reasonable suspicion for a Terry stop. The first of these cases is Adams v. Williams, 407 U.S. 143 (1972). In Adams, the Supreme Court concluded that a police officer was warranted in conducting a Terry stop on the basis of an in-person tip from a "person known to him" that a man "seated in a nearby vehicle [in a high-crime area] was carrying narcotics and had a gun at his waist." Id. at 144-45. The Court so held in large part

United States, 517 U.S. 806, 813 (1996).

because the informant was known personally to the police officer, and "had provided him with information in the past," and because the informant would be subject to prosecution for supplying false information to the police. Id. at 146. As a leading academic commentator on the Fourth Amendment has written, Adams makes clear that "suspicious circumstances reported to the police by a reliable [known] person in a nonconclusory fashion" may in certain circumstances be sufficient to warrant a Terry stop. 4 W. LaFave, Search and Seizure 576 (4th ed. 2004).

Anonymous tips are a different matter. The second relevant Supreme Court case, Alabama v. White, 496 U.S. 325 (1990), involved an anonymous telephone call to the police, which stated "that Vanessa White would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's motel, and that she would be in possession of about an ounce of cocaine." 496 U.S. at 327. The Supreme Court majority termed the resulting question of reasonable suspicion a "close case." Id. at 332. The Court concluded that a reasonable suspicion existed largely because the tip's assertion of White's destination had been "significantly corroborated," id. at 331, and because the tip demonstrated "the caller's ability to predict [White's] future behavior" and "a special familiarity with [her] affairs," id. at 332. Given all the circumstances, the Court

-10-

reasoned, the anonymous tip in White bore sufficient "indicia of reliability" to justify a Terry stop.

The third and most recent Supreme Court case dealing with tips in the context of Terry stops is Florida v. J.L., 529 U.S. 266 (2000). In J.L., "an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Id. at 268. The police arrived and found a young man matching that description. The Supreme Court concluded that the mere fact that the tip identified a specific person and alleged possession of a gun did not provide "indicia of reliability of the kind contemplated in Adams and White." Id. at 274. An anonymous tip not properly corroborated, the Court concluded, "does not justify a [Terry] stop." Id.

The defendant argues that the tip here was anonymous and uncorroborated (like the tip in J.L.). The government avers that the tip was neither truly anonymous (and so somewhat comparable to the tip in Adams) and that the tip was corroborated (like the tip in White). Our analysis takes two parts. We explain i) that the tip in this case, whether or not it can rightly bear the technical moniker "anonymous,"[8] was akin to the anonymous tips analyzed by

_____

[8] There are differing views on whether the police must normally treat as anonymous a hearsay tip, received from a known individual, that an unnamed third party has witnessed a crime. Compare United States v. Fernandez-Castillo, 324 F.3d 1114, 1117-18 (9th Cir. 2003) (finding tip non-anonymous where state highway

-11-

the Supreme Court in <u>J.L.</u> and <u>White</u> in that it could not provide reasonable suspicion unless corroborated; and ii) that because, as in <u>J.L.</u> and unlike in <u>White</u>, it was not sufficiently corroborated, the tip could not, by itself, provide reasonable suspicion for the vehicle stop.

### i. The Tip Itself

The government contends that the hearsay tip in this case was more reliable than the anonymous tip analyzed in <u>J.L.</u> because of the police officers' interactions with Cabral, and because Cabral was able to report a crime supposedly witnessed by his unnamed relative.

Certain of the government's arguments have superficial appeal. More so than in <u>J.L.</u>, the police here had some limited means of narrowing the class of people who might have provided the tip. <u>See</u> <u>J.L.</u> at 270 (noting danger when informant cannot "be held responsible" for false information). And Cabral's description of

---

department reported to police that unnamed highway department worker had witnessed erratic driving); <u>and</u> <u>United States</u> v. <u>Tucker</u>, 305 F.3d 1193 (10th Cir. 2002) (finding tip non-anonymous where government employee reported to the police that her former coworkers at another government agency had observed one of their coworkers viewing child pornography); <u>with</u> <u>Ferdandez-Castillo</u>, 324 F.3d at 1126-27 (Ferguson, J., dissenting) (arguing that <u>J.L.</u> controlled); <u>and</u> <u>Commonwealth</u> v. <u>Barros</u>, 755 N.E.2d 740, 745 n.7 (Mass. 2001) (explaining that <u>J.L.</u> does not distinguish among types of anonymous informants). Because the circumstances here are somewhat unusual, we decline to analyze hearsay tips from unnamed informants in the abstract and focus on the specific tip in this case.

his relative's report provided some small measure of context for the information that may not have been present if, as in J.L., the police had received a bare tip, out of the blue, alleging the same facts.[9]

Contrary to the government's suggestion, however, the tip in this case bears some important badges of unreliability not present in the cases relied upon by the government. First, there is the hearsay problem. While the police or a 911 operator often can make some rough judgments about the age, cognitive ability, and motivations of an anonymous informant based on her tone of voice (if the tip occurs via the telephone), or appearance and demeanor (if the tip is delivered in person even by a complete stranger), the police here had no way of knowing the state of mind of Cabral's relative when she gave her information, or whether she was a person who could be relied on to relate events accurately. In cases where uncorroborated hearsay tips have been deemed reliable in contributing to reasonable suspicion, there has been a stronger indication that the informant can be trusted. In Tucker, 305 F.3d at 1196, and in Fernandez-Castillo, 324 F.3d at 1116, for instance,

---

[9] Still, while the government analogizes to cases in which a person tells the police about things he has seen himself, this is simply not a case where the police received a "personal observation" or "first-hand account" of a crime. Cabral, from whom the police received the tip, had not observed anything on Shirley Street. See United States v. Cochran, 896 F.2d 635, 641 (1st Cir. 1990) (contrasting "personal observation" with "hearsay"); see also United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005).

the police knew that the unnamed hearsay informant was a government employee.

Second, there was a higher risk of fabrication here. The J.L. Court deemed anonymous tips inherently unreliable largely because such tips carry with them a risk of fabrication by the informant. See J.L., 529 U.S. at 271. The hearsay tip in this case provided two distinct opportunities for fabrication. The tip was suspect 1) because Cabral may have had a motive to get a rival gang member into trouble with the law and could have fabricated both the Shirley Street shooting and the supposed communication from his relative, and 2) because even if Cabral was honest in his interactions with the police, his unnamed relative may have had her own motive for fabricating incriminating evidence about a rival gang member whom she may have suspected of harboring ill will towards a member of her family.[10]  There is no indication in any of the cases cited by the government that either a hearsay informant

_____

[10] The government emphasizes Coyne's ability to observe Cabral's demeanor as he related the tip from his relative, and hence to evaluate the possibility that Cabral was fabricating that tip.  These observations, however, did not address the possibility that the unnamed relative had fabricated the tip.  The tip from Cabral's relative simply cannot be deemed more reliable by virtue of Cabral's face-to-face interaction with the police.  Compare J.L., 529 U.S. at 276 (Kennedy, J., concurring).  See also Adams, 407 U.S. at 146-47 (distinguishing known face-to-face informant from anonymous phone tipper); United States v. Romain, 393 F.3d 63, 73-74 (1st Cir. 2004) (distinguishing J.L. in a case where the police had face-to-face encounters with an unnamed informant that allowed them to gauge her reliability and because her appearance was known and she could be recognized and "held accountable" for the information she had provided).

-14-

or a party relaying a hearsay tip to the police had so obvious a motive to lie as existed in this case.

Finally, crucially, and unlike in J.L., the police had specific reasons to doubt the tip by the time they made their stop. In J.L., "there [were] no factors that cast doubt on the reliability of the tip." 529 U.S. at 271. In this case, there was no physical evidence of gunfire on Shirley Street (as there usually was after shootings in the neighborhood). No one had called the police to complain (usually neighborhood residents called 911 upon hearing gunfire). While officers in the city were alerted to be on the lookout, none saw Rodrigues or his car in the hours after the purported shooting or remembered seeing the car in the area of the purported shooting earlier that day. The government does not suggest, moreover, that in the week after the hearsay tip, the tipster or Cabral came forward with additional information; that any other witnesses to a Shirley Street shooting were found; or that physical evidence of a shooting or unexplained gunshot wounds in local hospitals emerged. When an initial police investigation into a tip of illegal activity reveals factors inconsistent with the tip, the reasonable suspicion analysis must take these indicia of unreliability into account along with any indicia of reliability. See Adams, 407 U.S. at 147; see also Terry, 392 U.S. at 30; Brent v. Ashley, 247 F.3d 1294, 1303 (11th Cir. 2001). Here, the investigation the police had conducted actually

-15-

undermined the tip's reliability.

### ii. Corroboration

The fact that the license plate number mentioned in the tip led to Rodrigues provides a solid means of identification, but it does not corroborate the tip's assertion that there had been a shooting on Shirley Street. When police officers stop a person in reliance on a tip, "reasonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." J.L., 529 U.S. at 272. The positive identification of Rodrigues did nothing to bolster the tip's "assertion of illegality." Id.

The government also argues that Rodrigues's recent arrest and reputation as a gang member provided corroboration for the tip. While "knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion," United States v. Sandoval, 29 F.3d 537, 542 (10th Cir. 1994) (collecting cases); see also United States v. Jerez, 108 F.3d 684, 693 (7th Cir. 1997), there may be Terry-stop cases in which corroboration comes in part from an individual's gang affiliation and/or recent arrests for conduct related to the activity referred to in a tip. Criminal history certainly can be considered in a reasonable suspicion analysis. See United States v. Daoust, 916 F.2d 757, 759 (1st Cir. 1990) (Breyer, C.J.). And cases in other circuits have recognized that

-16-

a history of crime and gang involvement can corroborate other evidence to establish reasonable suspicion that criminal conduct has occurred or is occurring. See United States v. Feliciano, 45 F.3d 1070, 1074 (7th Cir. 1995) (Posner, J.) (holding that police officer's knowledge that search subject was "a gang member recently released from prison," combined with observations and citizen complaint suggesting that subject had just attempted to mug a passerby and might do so again, contributed to reasonable suspicion). As the Feliciano court recognized, an individual's affiliation with a violent gang and prior criminal conduct may be probative of the likelihood that he has or is about to complete another, similar crime. Id.

But, here, the officers' awareness of Rodrigues's involvement in gang activity and his prior arrest is not linked to any reliable information about criminal activity on Shirley Street. In the cases the government relies upon, courts have found that an individual's criminal history corroborated reliable information, such as a police officer's own observations, in constituting reasonable suspicion. In United States v. Christmas, 222 F.3d 141, 143-45 (4th Cir. 2000), the police conducted a Terry stop of a man they knew to be a convicted criminal, after receiving a face-to-face complaint by the man's neighbor, who risked retaliation for asking the police to intervene, and viewing objective indications of ongoing criminality. In Feliciano, it was the police officers'

own observations of suspicious activity that led them to follow and identify the individual they stopped. 45 F.3d at 1074. In these cases, the police officers observed conduct indicating that an individual was engaged in criminal behavior, and their knowledge of the individual's criminal history helped to dispel any likelihood that the observed conduct actually was innocent.[11] Here, the danger was that no criminal activity had occurred on Shirley Street at all.[12] Given the objective indications that there had been no Shirley Street shooting, Rodrigues's arrest and reputation are, at best, only a minimal indication that the criminal activity complained of in the hearsay tip had occurred.

Where "a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more

_____

[11] The government also cites United States v. Mitchell, 256 F.3d 734 (7th Cir. 2001). In that case, the police responded within 90 seconds to an anonymous report of a shooting and found the defendant, who matched the description of the shooter. The police asked the defendant a question and then, after observing his behavior and realizing that he was a convicted felon known for his violence, conducted a Terry stop because they feared that they would be shot in the back if they proceeded without patting the defendant down. Id. at 737. The government does not suggest any similar justification for the stop in this case.

[12] The situation here also is far different from one in which an anonymous tipster accurately forecasts another individual's "not easily predicted movements" in a manner that confirms the tipster's knowledge of the subject's criminal intentions. J.L., 529 U.S. at 269 (internal quotation marks omitted). In this case, nothing the police learned after the tip falls into the category of information that could "not easily [be] predicted" by a tipster intending to mislead the police.

reliable." <u>White</u>, 496 U.S. at 330. <u>See also</u> 4 LaFave, <u>supra</u>, at 589 (reasoning that a tip with "lesser 'indicia of reliability'" provides reasonable suspicion "only when other facts and circumstances indicate no substantial risk of fabrication"). Here, as in <u>White</u>, the tip could not be deemed reliable in and of itself. <u>Compare</u> <u>Adams</u>, 407 U.S. at 144-47 (evaluating a tip from a "known" individual, who had "provided [] information in the past"). And, as in <u>J.L.</u>, even with the minimally corroborative factors cited by the government, the police had uncovered nothing of importance that could indicate the reliability of the hearsay tip. To the contrary, the initial police investigation did more to discredit the hearsay tip than to corroborate it. <u>Compare</u> <u>White</u>, 496 U.S. at 331-32 (concluding that tipster's "honest[y]" and "inform[ation]" were corroborated when informant "demonstrated . . . a special familiarity with the [stopped individual's] affairs"). For these reasons, we conclude that the tip standing by itself was insufficient to provide reasonable suspicion for the March 31st vehicle stop.

## B.  **The Totality of the Circumstances on March 31st**

The government argues that even if it was insufficient by itself, the hearsay tip, evaluated in light of Rodrigues's arrest and reputation as a gang member, when combined with other circumstances -- the Eastman Street shooting and the "ongoing gang warfare" -- justified the vehicle stop. We disagree.

First, what happened (and did not happen) in the week between the hearsay tip and the stop reduced the weight that the tip could carry in the reasonable suspicion analysis.  In Hensley, which also involved an investigatory stop conducted several days after a crime, the Supreme Court indicated that the reasonable suspicion analysis should take into account the passage of time between a reported crime and a Terry stop.   The Hensley Court explained that the "factors in the balance" of determining whether a Terry stop is permissible, "may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct."  Hensley, 469 U.S. at 229.

> This is because the governmental interests and the nature of the intrusions involved in the two situations may differ. . . .  A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. . . .  [Additionally,] officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

Id.  See also United States v. Hudson, 405 F.3d 425, 434-37 (6th Cir. 2005) (discussing Hensley standard in the context of an informant's tip); United States v. Quarles, 330 F.3d 650, 653-56 (4th Cir. 2003) (same); 4 LaFave, supra, at 288 (noting that Terry stops to investigate past criminal activity "require somewhat different analysis").

As we indicated above, by the time the stop occurred, a full week after the hearsay tip, the police had investigated the tip and found no corroboration, excluding Rodrigues's reputation and his arrest three weeks earlier, that a Shirley Street shooting had occurred. Questionable Terry stops may become even less reasonable if "the police have had the time to develop" better grounds for the stop but have failed to do so. United States v. Hudson, 405 F.3d 425, 437 (6th Cir. 2005) (explaining that Hensley incorporates an expectation that police will make efforts to investigate crimes, and that "courts will hold the police to this expectation in appropriate cases"). By March 31st, the tip could provide only a marginal benefit to the government in a reasonable suspicion analysis.

Similarly, while there may be a rationale for according special weight to anonymous tips in cases of an imminent threat to public safety, there was no imminent threat in this case. See J.L., 529 U.S. at 273-74 (recognizing that in some cases, such as "a report of a person carrying a bomb," "the danger alleged in an anonymous tip may be so great as to justify a search without a showing of reliability"). True, if the vehicle stop had occurred immediately after the tip on March 25th, and before any opportunity for investigation, the government might have argued that an imminent threat existed -- facing two reported shootings, the police may have had legitimate reasons to fear that another

-21-

shooting might soon occur. But the police did not report any reason to suspect that Rodrigues and his car posed a danger on March 31st, and the government does not argue that there was any such reason. The lack of any indication of an immediate threat to the public also differentiates this case from many in which a stop has been based on a corroborated anonymous tip of ongoing criminal activity, see, e.g., United States v. Wheat, 278 F.3d 722 (8th Cir. 2001) (reckless driving); State v. Walshire, 634 N.W.2d 625 (Ia. 2001) (drunk driving); 4 LaFave, supra, at 596-97. In these cases, there were strong exigent rationales for quick police action (e.g., imminent danger to the public and loss of evidence) that are altogether absent here.

Furthermore, contrary to the government's assertion, we are not persuaded that there were any other substantial "governmental interests," Hensley, 469 U.S. at 229, involved in the March 31st vehicle stop. In a Terry stop to investigate a completed crime, there normally is either a reasonable suspicion that the person stopped is the known individual wanted for a crime that is known to have occurred, see, e.g., Hensley, 469 U.S. at 224 (police department had issued "wanted flyer" for driver) or a reasonable suspicion that the stop will uncover evidence of a recently-committed crime, see, e.g., United States v. Tilmon, 19 F.3d 1221, 1225 (7th Cir. 1994) ("exact match" of subject and his car to those described as involved in bank robbery two hours

earlier). Some of these rationales might plausibly have been articulated if Coyne and Griffiths had seen and stopped Rodrigues on March 25th, before there was time for any investigation and shortly after the purported Shirley Street shooting was supposed to have taken place. (At that point, for instance, the officers might have expected to detect fleeting physical evidence of a recent shooting, such as a hot gun, gunpowder residue, or the odor of gunpowder on Rodrigues's person.) But none of these rationales applies to the March 31st stop.

This also might have been a different case if the police had demonstrated that they had no better way to question Rodrigues a week after the purported crime on Shirley Street. We can envision circumstances where a Terry stop to investigate a completed crime may be justified in part because the police have searched for a suspect in all his usual haunts but failed to find him. In those circumstances, a suspect's unusual absence may be probative of an effort to elude the police and an articulable indication of specific past criminal activity. But there is no evidence that this was such a case.

In the end, the police had little more reason to suspect Rodrigues of specific criminal activity on March 31st than they did before receiving the hearsay tip. The police suspected Rodrigues of being affiliated with a gang and knew of his recent arrest. And the police knew that there had been gang violence in the

neighborhood.  But the government does not suggest that the police had information tying Rodrigues, personally, to any of this violence.  The only possible crime to which the police could tie Rodrigues -- the Shirley Street shooting -- was one that appeared, in all likelihood, never to have occurred.  After considering all of the circumstances relevant to the March 31st stop, we conclude that the district court correctly suppressed the evidence derived therefrom.

**<u>Affirmed</u>**.