**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 39908**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2013 Opinion No. 65** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: December 10, 2013** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| DANIEL L. WIDNER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Elmore County. Hon. Lynn G. Norton, District Judge.

Judgment of conviction and sentences for trafficking in marijuana and concealing a dangerous weapon in a motor vehicle, <u>affirmed</u>.

Nevin, Benjamin, McKay & Bartlett, LLP, Boise, for appellant. Deborah A. Whipple argued.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent. Lori A. Fleming argued.

_____

PERRY, Judge Pro Tem

Daniel L. Widner appeals from his judgment of conviction for trafficking in marijuana, felony, Idaho Code § 37-2732B(a)(1)(A), (D), and concealing a dangerous weapon in a motor vehicle, misdemeanor, I.C. § 18-3302(9), (14). Widner argues that the trial court erred by denying his motion in limine that sought to exclude from evidence the 2.25 pounds of marijuana officers found in his car. We affirm.

**I.**

**BACKGROUND**

Detective Christopher Jessup had entered into an agreement with a confidential informant who was "working off" a delivery of marijuana charge with the local police. The identity of the

1

confidential informant was known to police but not disclosed at the hearing.[1] As part of their arrangement, Jessup and the confidential informant organized a series of controlled buys where the confidential informant purchased marijuana on behalf of police. The confidential informant identified Widner as a potential investigative target. On October 19, 2010, and on December 14, 2010, the confidential informant purchased marijuana from Widner.

On January 11, 2011, the informant told Jessup that Widner was planning a trip to California in order to purchase marijuana which he would, in turn, sell in Idaho. The informant believed Widner would go on the upcoming weekend or the weekend after. Jessup directed the informant to confirm the information and report back. The informant did not immediately report back. Instead, on January 21, the informant told Jessup that Widner was probably out of marijuana. Jessup asked the informant to attempt to gather additional information. Later, on the same day, the informant contacted Jessup a second time and stated that Widner was still in town, but planned to travel to California. The informant did not specify any particular date.

The informant did not contact Jessup again until Wednesday, January 26. On that day, he informed Jessup that he had not spoken to Widner for "a couple days" but believed that Widner would travel to California that weekend. On Saturday, January 29, the informant once again told Jessup that he had not heard from Widner in a few days, but he believed Widner had left Mountain Home. In response, officers began conducting surveillance of Widner's home. Later that day, the informant called Jessup and stated that Widner was still in Mountain Home, but that he planned to leave early the next morning and would return later that day or the day after, January 31.

On January 30, Jessup attempted to verify the information he had been provided. He drove by Widner's home and observed that both of Widner's vehicles were parked at the home. Jessup called the informant and asked him to confirm that Widner had left, and to determine what car he had taken. At that time, the informant did not have any new information regarding Widner's whereabouts nor did he know what car was being driven. However, later that day, the informant called Jessup and told him that Widner and his roommate, Alex Stewart, had taken Stewart's vehicle to California and had left that morning.

---

[1] The gender of the informant was not revealed. For the sake of convenience, we will use male pronouns to refer to the confidential informant.

From prior surveillance, Jessup was familiar with Stewart's vehicle. Jessup drove by Widner and Stewart's home and observed that Stewart's vehicle was not at the home, nor was his car at either of Stewart's places of work. After confirming that the vehicle was not in any of its ordinary locations, Jessup and his partner planned to intercept Widner upon his return to Mountain Home. They decided to wait at opposite ends of town and look for the vehicle. They also informed the patrol shift supervisor that they were looking for Stewart's car.

The case was discussed at a "pass-along meeting" where officers from an earlier shift relate information regarding ongoing cases. The patrol shift supervisor instructed Officer Ryan Melanese, among others, to be on the look out for Stewart's car and provided him with the license plate number. At the meeting, Melanese was informed that detectives suspected Stewart's vehicle contained a large amount of marijuana. Accordingly, the shift supervisor told Melanese to develop his own probable cause before making a traffic stop, and if he could not, then to radio the detectives.

On January 31, Melanese was engaged in patrol activities using a radar gun to determine the speed of passing vehicles. While doing so, he observed Stewart's vehicle. Melanese followed the vehicle for three quarters of a mile and noted that the car was travelling below the speed limit. Melanese became suspicious that the driver might be intoxicated, but this suspicion was not confirmed by weaving or erratic driving. Thereafter, Melanese observed the vehicle travel down a street which broadened from a one-lane road into a two-lane road. Melanese believed the driver was required to signal when that occurred. Likewise, the vehicle travelled down a street which intersected a second street and angled off to the right. The driver continued down the street, angling his car to the right without signaling. Melanese believed this too was a traffic violation. Believing he had a sufficient basis to make a stop, Melanese activated his overhead lights and stopped the vehicle.

Melanese approached the vehicle to speak with Widner, who was the driver. Melanese observed that the driver's window was open a few inches and smelled a slight odor of marijuana through the open window. He then asked Widner to roll the window down further to speak with him. Widner said that the window was broken and could not be rolled down any further. The officer replied by asking Widner to open the door. Widner complied with the request and when he did so, the officer smelled a heavy odor of marijuana.

3

After the door was opened, the officer also requested that both Widner and Stewart produce identification. After receiving the identification, Melanese asked dispatch to run records checks on Widner and Stewart. Dispatch indicated that neither had any active warrants so Melanese returned to the car and ordered Widner out of the car. Melanese asked Widner if he had smoked marijuana and Widner denied doing so. Melanese began to observe Widner for other signs of impairment. He noted that Widner was shaking. Given the weather, the officer believed the shaking could be caused by the cold and asked Widner if he wanted his jacket from inside the car. Widner said that he wanted the jacket, but only if he could retrieve it himself. In response, Melanese offered to retrieve the jacket for Widner. Widner declined the offer and admitted that there was a small plastic bag containing marijuana in his jacket pocket. Thereafter, Widner was permitted to get his jacket from inside the vehicle and he turned over the marijuana. Then, Widner was handcuffed and placed into a patrol car.

Thereafter, another officer arrived on scene with a drug detection dog. That officer took the dog around the car and the dog alerted, indicating the presence of drugs. After the alert, the officers searched the car and found 2.25 pounds of marijuana in boxes in the backseat of the vehicle.

Widner was charged with trafficking in marijuana, felony, Idaho Code § 37-2732B(a)(1)(A), (D), and concealing a dangerous weapon in a motor vehicle, misdemeanor, I.C. § 18-3302(9), (14). Widner entered a conditional guilty plea preserving his right to appeal the validity of the traffic stop.

## II.

## ANALYSIS

On appeal, Widner's sole claim is that the police lacked reasonable and articulable suspicion to stop him. In the district court, the State offered two bases upon which the stop was justified. The first basis was the alleged traffic infractions, i.e., the two times Officer Melanese believed Widner was required to signal. The trial court ruled that neither of the alleged traffic infractions violated the law. The State does not challenge this determination on appeal. Therefore, on appeal, the issue is whether the alternative basis for the stop, suspicion founded on reports by the confidential informant, was a sufficient basis for the stop. Widner argues that the confidential informant's tips did not create reasonable and articulable suspicion.

4

Although the original motion was entitled a motion in limine, the parties and the trial judge treated this motion as a motion to suppress evidence. Accordingly, we treat this motion as a suppression motion. The standard of review of a suppression motion is bifurcated. When a decision on a suppression motion is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

A traffic stop by an officer constitutes a seizure of the vehicle's occupants and implicates the Fourth Amendment's prohibition against unreasonable searches and seizures. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Atkinson*, 128 Idaho at 561, 916 P.2d at 1286. Under the Fourth Amendment, a traffic stop must be supported by reasonable and articulable suspicion that the vehicle is being driven contrary to the traffic laws or that either the vehicle or an occupant is subject to detention in connection with violation of other laws. *State v. Davis*, 139 Idaho 731, 734, 85 P.3d 1130, 1133 (Ct. App. 2003). Whether the officer had the requisite reasonable suspicion to detain a citizen is determined on the basis of the totality of the circumstances, i.e., the collective knowledge of all those officers and dispatchers involved. *Wilson v. Idaho Transp. Dep't*, 136 Idaho 270, 276, 32 P.3d 164, 170 (Ct. App. 2001). The reasonable suspicion standard requires less than probable cause but more than mere speculation or instinct on the part of the officer. *State v. Ferreira*, 133 Idaho 474, 483, 988 P.2d 700, 709 (Ct. App. 1999).

In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court adopted a totality of the circumstances test to determine if an informant's tip creates reasonable and articulable suspicion to support a traffic stop. The Court also held that certain factors used in a prior, abandoned "two-prong test" were still relevant when performing a totality of the circumstances test. *Id.* at 328-29. The relevant factors include "an informant's 'veracity,' 'reliability,' and 'basis of knowledge.'" *Id.* The Idaho Supreme Court adopted *White* in *State v. Bishop*, 146 Idaho 804, 811-12, 203 P.3d 1203, 1210-11 (2009). It also set forth a broader list of factors which indicate that a tip is reliable:

Factors indicative of reliability include whether the informant reveals his or her identity and the basis of his or her knowledge, whether the location of the informant is known, whether the information was based on first-hand observations of events as they were occurring, whether the information the informant provided was subject to immediate confirmation or corroboration by police, whether the informant has previously provided reliable information, whether the informant provides predictive information, and whether the informant could be held criminally liable if the report were discovered to be false.

*Bishop*, 146 Idaho at 812, 203 P.3d at 1211.

Widner concedes that this is the appropriate test, but argues that the tip did not create reasonable and articulable suspicion because (1) the confidential informant gave officers incorrect information on several occasions; (2) the informant's reports were based upon hearsay; and (3) the hearsay declarant was not identified and thus, his or her reliability cannot be established. These arguments focus on two particular *Bishop* factors: the reliability of the reports the informant previously provided to police and the informant's basis of knowledge.

The trial court ruled that Melanese had reasonable and articulable suspicion to stop Widner based upon the collective knowledge doctrine, the informant's reports, and the officers' verification of those reports. Widner argues that the report on January 11 and the first report on January 29 demonstrate that the trial court's ruling was erroneous because these reports show that the informant provided unreliable information.

The trial court did not find that the informant's reports on January 11 or January 29 rendered him unreliable. We conclude that the trial court's determination was supported by the evidence because the record shows that the informant had previously provided reliable information. The confidential informant reported that Widner sold marijuana and this was confirmed by two controlled buys. Likewise, the informant's January 30 report that Stewart and Widner had travelled in Stewart's car was confirmed when police looked for Stewart's car and could not find it in Mountain Home. Finally, the informant's second report on January 29 indicated that Widner had left town and would return either late on January 30 or early on January 31. This report was confirmed by police when they observed Stewart's car coming into town on the morning of January 31. The accuracy of these reports is substantial evidence supporting a determination that the informant had previously provided reliable information.

Conversely, the two occasions Widner cites as evidence of unreliability are not persuasive. On January 11, the informant reported that Widner was planning on leaving that

6

weekend or the weekend after. The fact that Widner did not travel to California on either weekend is not persuasive evidence of unreliability. First, courts "have never required that informants used by the police be infallible" in order for them to be found reliable. *Illinois v. Gates*, 462 U.S. 213, 245 n.14 (1983). Second, people can and do change indefinite or inchoate plans. From the record, it appears that any plan, as described by the informant, was an indefinite plan because Widner had not determined when exactly he would travel.

Widner also argues that the informant's report on January 29 indicating that he believed Widner was out of town renders the informant unreliable because Widner did not leave town on that day. Once again, we do not conclude that this warrants a determination that the informant was unreliable. First, the informant phrased his tip as mere belief and also indicated that he had not spoken to Widner in days. Second, the informant was able to provide updated information on the same day and this new information was confirmed by police. Because there is substantial evidence that the informant was reliable and because the examples Widner cites as evidence of unreliability are not persuasive, we conclude that this *Bishop* factor was met; the informant had previously provided reliable reports.

Turning to the other *Bishop* factor Widner focuses on, he argues the tip was not reliable because the State failed to show the informant's basis of knowledge. The record shows that the informant's basis of knowledge was not set forth at the hearing. However, this does not render the informant unreliable. In *Bishop*, the Idaho Supreme Court observed that the defendant failed to present any "authority to support the proposition that a citizen-informant's tip should be reclassified as anonymous based solely on his or her basis of knowledge." *Bishop*, 146 Idaho at 813, 203 P.3d at 1212. Widner cites to *United States v. Monteiro*, 447 F.3d 39 (1st Cir. 2006) for the proposition that "when a tip [is] based upon hearsay from an unknown source, it is akin to an anonymous tip." However, *Monteiro* does not support this contention. *Monteiro* stands for the proposition that a tip is not reliable when it relies upon hearsay from an unknown source, where both the informant and the unknown source have significant incentives to fabricate their reports because they are biased against the defendant, and where the substance of that tip has been undermined because "an initial police investigation into a tip of illegal activity reveals factors inconsistent with the tip." *Id.* at 45-47. The facts in *Monteiro* are distinguishable from the facts in this case. In particular, no evidence was presented to show that the informant was biased against Widner or that police found facts which undermined the substance of the tip. Finally, in

*Bishop*, the Idaho Supreme Court discussed the import of the fact that a tipster's knowledge is based upon hearsay. The Court held:

> [T]he fact that a tip is based on hearsay information is only a factor to consider in determining whether a stop was justified--it is not an absolute bar to a finding of reasonable suspicion. However, the original hearsay declarant's basis of knowledge, reliability, and veracity are also factors under the totality of the circumstances analysis.

*Bishop*, 146 Idaho at 813-14, 203 P.3d at 1212-13 (citations omitted).

In addressing the other *Bishop* factors, we conclude there is substantial evidence supporting the district court's determination that the tip was reliable. The identity and location of the informant were known to police who maintained frequent contact with him. Moreover, as a result of his agreement with police, he was subject to criminal liability if he provided false information to police officers. Furthermore, the informant's definitive statements were confirmed by the police investigation. The informant indicated that Widner had left town, travelled in his roommate's vehicle, and was taking a trip of a certain duration. Police observed that Stewart's car was not parked in any of the usual locations after the informant indicated it would be gone. Later, the police observed the car coming into town from a direction consistent with out-of-town travel and at the predicted time.

Finally, while the precise basis of the informant's knowledge was not set forth, the evidence shows the informant knew significant facts about Widner's drug operation. He knew Widner sold marijuana as evidenced by the two controlled buys. He also knew approximately how much inventory Widner had at any point in time. Furthermore, he had information regarding Widner's supplier and the manner in which the supplier would provide Widner with drugs.

Additionally, the evidence shows that the informant had direct or indirect access to Widner himself. Many of the tips reflect Widner's plans to travel on certain days, at certain times, with certain people, in a certain car, to a certain place. For a third party to know of these plans Widner must have communicated them, directly or indirectly, to the informant. These tips could not result from mere observation of Widner because Widner's planning is not an observable fact. This conclusion is also supported by the fact that the informant told police on several occasions that he had not spoken to Widner recently but, on at least two occasions, was able to update police in response to further police inquiries. On both occasions, the updates were

given on the same day as the request for an update.  Accordingly, while the precise details about the informant's source of knowledge are unknown, the record shows that the informant had ready access to significant details regarding Widner's operation and that Widner himself was either the direct or indirect source of that information.

In *White*, the Supreme Court held that similar factors, along with corroboration, rendered an anonymous tip sufficiently reliable to justify a stop.  *White*, 496 U.S. at 332.  In that case, the witness predicted future behavior which made clear that the informant was "privy to [the defendant's] itinerary" and the Court reasoned that such a person was "likely to also have access to reliable information about that individual's illegal activities."  *Id*.  The corroborated report of the known informant here, conveying similar information, constitutes reasonable and articulable suspicion for the stop of the automobile.

### III.

### CONCLUSION

We hold that under the totality of the circumstances, the information from the informant was reliable.  Because it was reliable, there was reasonable suspicion for officers to perform a traffic stop.  We affirm Widner's judgment of conviction.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**