47 F.3d 1174
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff/Appellee,
v.
Terry L. WHITE, also known as Jamie Wilson, Defendant/Appellant.
 No. 94-2575.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 24, 1995.
Decided Feb. 13, 1995.
 
 Before POSNER, Chief Judge, CUMMINGS and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Terry White, who entered a conditional plea of guilty to being a felon in possession of a firearm, 18 U.S.C. Sec. 922(g), has expressly reserved his right to appeal the denial of his motion to suppress the evidence of his possession of the firearm. Fed.R.Crim.P. 11(a)(2). He claims that the police discovered the weapon as a result of an unconstitutional search and seizure.
 
 
 2
 On October 9, 1992, a few minutes before the end of school at Elston High School, in Michigan City, Indiana, Principal Timothy Bietry saw from his office window four suspicious older men on school property. As two of the men approached the northern entrance of the school, Bietry told his secretary to call the police.[1] He stopped the two men, who were just inside the door, and escorted them out. The other two men also started to leave. As he followed behind the first two men, an unknown elderly woman left her car, which was parked on the street in front of the northern entrance, and proceeded up the walkway toward the entrance. Meanwhile, Detective Sergeant Johnny Hudson, the first officer to arrive, was proceeding down the walkway. As the elderly woman passed by, she whispered to Bietry that one of the four men had a gun. At or around this time, all four men stopped at various points on the walkway and turned to face Bietry.
 
 
 3
 Passing by the four men, Hudson reached Bietry within seconds. Bietry told Hudson about the suspicious individuals. Officer Denise Jones, who was not in uniform, arrived while Hudson talked with the principal.[2] She asked White and a younger man, who were walking down the walkway toward the sidewalk, to stop and directed them to a nearby wooden fence.[3] The district court found that Jones initially intended to segregate the men in order to discern the nature of the dispatch call. She testified that she could not recall whether she asked White any questions, although she said she probably had asked him why he was there. However, she could not recall any response because of the behavior of the younger man, whom she recognized as a former member of her church. Some of the students who were leaving the building shouted "Folks," a generic term that encompasses a number of street gangs. While Jones attempted to talk to the younger man, he showed off for the students by telling them that he was a gang member.
 
 
 4
 At this point, Principal Bietry informed Sergeant Hudson that one of the four subjects possibly had a gun. Jones had also overheard Bietry's comment to Hudson. Following Hudson's lead, Jones helped Hudson round up the men who had started to disperse. Bietry could not recall hearing any commands to stop from any officer prior to this moment. Hudson instructed Officers Charles Dickey and Sean Steele, who had arrived around this time, to check the four men for weapons. While frisking White, Dickey saw a chrome pistol under White's foot. White admitted that he did not have a permit, and Dickey arrested him. The other three men were questioned and released.
 
 
 5
 The district court held that the initial contact between Jones and White was consensual. It further found that Hudson and Dickey had properly performed an investigative stop and frisk based upon a reasonable articulable suspicion of criminal wrongdoing. Thus the court denied the motion to suppress the evidence of the gun. White claims that Officer Jones stopped him without a reasonable articulable suspicion, and further that Hudson and Dickey had also engaged in an unconstitutional search and seizure. Thus, he claims that the district court erred by failing to suppress the evidence gained by this unconstitutional search.
 
 
 6
 We review a district court's factual and legal determinations on a motion to suppress for clear error.... A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
 
 
 7
 Rice, 995 F.2d at 722 (citations omitted).
 
 
 8
 A. Officer Jones' Initial Contact With White Was Consensual.
 
 
 9
 White contends that Officer Jones subjected him to an investigative stop without a reasonable articulable suspicion that a crime had been or was being committed. The district court found that Jones did not need a reasonable suspicion because the initial contact between Jones and White was not a seizure. " 'So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.' " United States v. Adebayo, 985 F.2d 1333, 1338 (7th Cir.) (quoting United States v. Williams, 945 F.2d 193, 196 (7th Cir.1991)), cert. denied, 113 S.Ct. 2947 (1993). The test is whether, " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " Id. (quoting United States v. Withers, 972 F.2d 837, 841 (7th Cir.1992)).
 
 
 10
 In evaluating the totality of the circumstances, many of the factors applicable in this case clearly favor the district court's finding of a consensual encounter. First, although technically private property, the walkway was open to public view by both people in the street and by the young people streaming out of the building. See id. Second, only Officer Jones was talking to White at the time; he did not face the intimidating presence of several officers. Id. Third, Officer Jones was dressed in plain clothes. Id. Fourth, the district court found that she did not display her weapon or touch him. Id. Furthermore, in a case addressing the voluntariness of the search of a vehicle, we noted that the defendant "was not an overawed youngster being confronted with law enforcement for the first time." Rice, 995 F.2d at 724. White, who had prior criminal convictions, testified that the presence of the officers at the scene "didn't bring up any particular scares in me, no. I wasn't worried."
 
 
 11
 The other relevant factors also do not weigh toward finding an investigative stop. First, in White's favor, the district court apparently found that Jones asked the two men to move to a fence by the end of the walkway, although evidence in the record indicates the contrary. However, this fact alone is not sufficient to tip the balance in White's favor. The record indicates the distance was relatively short.[4] Cf. United States v. Mendenhall, 446 U.S. 544, 548, 557 (1980) (upholding district court's finding that, under the circumstances, woman implicitly consented to accompany officers to upstairs office fifty feet away); United States v. Parker, 936 F.2d 950, 953-54 (7th Cir.1991) (upholding district court's finding that woman consented when officer stopped her and directed her to follow him one hundred feet to luggage counter); United States v. Moreno, 897 F.2d 26, 28-29, 30-31 (2d Cir.1990) (upholding district court's finding that two officers requesting two men to "come over here for a second," and each officer accompanying one of the two men from street into vestibule of building was consensual encounter). Second, although both Jones and White stated that she "asked" him to stop, the record contains little evidence concerning her use of language or tone of voice, from which we might determine whether she implied that compliance might be compelled. United States v. Withers, 972 F.2d 837, 842 (7th Cir.1992). However, the small amount of circumstantial evidence available tends to indicate a less authoritative approach. Jones had recognized one of the men as a former member of her church, and Bietry testified that he could not recall hearing anyone command the men to stop before Hudson began to round them up. Third, we may take into account whether the suspect consented or refused to talk to the police. Id. In this case, Jones could not recall whether White responded because the other man distracted her. However, in his own version of the facts, White had volunteered an explanation even though she did not ask him any questions. Finally, in White's favor, the record contains nothing to indicate that Officer Jones ever informed him that he was not under arrest and was free to leave. Id. However, under the totality of the circumstances, the district court did not clearly err by finding that Jones' conversation with White was a consensual encounter that did not implicate the Fourth Amendment.
 
 
 12
 B. Officer Hudson's Stop Did Not Violate The Fourth Amendment.
 
 
 13
 White contends that "he was detained by Hudson who, White submits, also lacked sufficient articulable facts." (Appellee's Br. at 13.)[5] As we recently stated,
 
 
 14
 [a] person may be stopped for brief questioning and a pat-down search if, even though the police do not have probable cause to believe that he has committed or is in the course of committing or about to commit a crime, and therefore could not lawfully arrest him, they have an articulable suspicion (more precisely, or at least elaborately, "a reasonable suspicion supported by articulable facts") that any of these things might be so.
 
 
 15
 United States v. Feliciano, No. 94-2395, 1995 WL 21943, at * 2 (7th Cir. Jan. 17, 1995) (citations omitted); see United States v. Packer, 15 F.3d 654, 658 (7th Cir.1994). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' ... The Fourth Amendment requires some 'minimum level of objective justification' for making the stop." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citations omitted). "The police must be able to give a rational explanation for why they suspected the person they stopped.... But the standard must not be set too high, for otherwise, ... 'the uncaring time-server who wears a badge will rarely be stirred to stop and frisk anyone,'...." Feliciano, No. 94-2395, 1995 WL 21943 at * 2 (quoting United States v. Feliciano, 830 F.Supp. 448, 450 (N.D.Ill.1993) (district court opinion)). In determining whether the officer's suspicion was reasonable, we review the totality of the circumstances, which includes "the officers' experience and knowledge, the characteristics of persons engaged in illegal activities, and the behavior of the suspect." United States v. Sterling, 909 F.2d 1078, 1083-84 (7th Cir.1990); see Packer, 15 F.3d at 658.
 
 
 16
 In this instance, Hudson suspected that these four men were armed and dangerous and that their presence might lead to a violent encounter. See Feliciano, No. 94-2395, 1995 WL 21943 at * 3 ("The officers also had an articulable suspicion that either Feliciano and Mason, or both, were armed, and--since few people are authorized to carry concealed weapons--armed illegally."). White contends that Hudson lacked sufficient facts to support the reasonability of his suspicion. Hudson based his suspicion upon
 
 
 17
 prior knowledge,[6] and also the four individuals not being students and showing up at the time the kids come out, being on the school property, and then the kids yelling Folk[s], and then the principal indicating that he had been told somebody of the four had a gun.
 
 
 18
 (Tr. at 23-24.) The district court found Hudson's suspicion well founded, and it imputed this suspicion to Officer Dickey, the officer who was at the scene in communication with him and performed the frisk. See United States v. Nafzger, 974 F.2d 906, 911 (7th Cir.1992). We agree.
 
 
 19
 Hudson testified that before Bietry mentioned the gun, Hudson had not seen White break any laws, including criminal trespass, or perform any acts for which Hudson could arrest him. However, by this point, Hudson knew that four men who were not students were on the school property and that two of them had entered the building. These facts undoubtedly added to the reasonability of the officer's suspicion. Although the two men inside the building complied with the request for them to leave and all four had started to walk away when Hudson arrived, these facts do not necessarily detract from his subsequent suspicion that they might yet commit some violent assault. Feliciano, No. 94-2395, 1995 WL 21943 at * 3 (holding that officers were "independently justified" in stopping unsuccessful robbers who were leaving because officers suspected "that they might try to rob some other hapless passerby.").
 
 
 20
 Hudson also supported his suspicion by referring to the suspected gang membership of the men and to the tip concerning the gun. Although the men's appearance did not initially indicate gang membership, Hudson became concerned that the four men were in fact gang members. He was concerned because of the student's "Folks" comments, which referred to a certain group of gangs, and because he recognized one of the men, Orlando Hatch, who he knew associated with gang members.[7] In Feliciano, we said that
 
 
 21
 "[k]nowledge of gang association and recent relevant criminal conduct, while of doubtful evidentiary value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a Terry stop."
 
 
 22
 Id. at * 4. However, we must determine how much weight should be placed upon the gang membership component in the totality of circumstances.
 
 
 23
 Feliciano dealt with the recognition of a gang member in a suspected crime that otherwise appeared unrelated to gang activity. See United States v. Chhunn, 11 F.3d 107, 110 (8th Cir.1993) (noting inter alia suspected robber's association with suspected gang members). However, courts more often rely on gang involvement when the gang has been connected to the suspected criminal activity, such as smuggling drugs, United States v. Weaver, 966 F.2d 391, 394 & n. 2, 395 (8th Cir.) (including fact that defendant was rough dressed young black male who might be a member of a Los Angeles drug smuggling gang), cert. denied, 113 S.Ct. 829 (1992), or active, violent hostility between rival gangs, United States v. Wheeler, 800 F.2d 100, 103 (7th Cir.1986), overruled in part on other grounds, United States v. Sblendorio, 830 F.2d 1382 (7th Cir.), cert. denied, 484 U.S. 1068 (1987); United States v. Pelusio, 725 F.2d 161, 166 (2d Cir.1983). In this case, Hudson did not link the suspected gang membership to any specific criminal activity. However, membership alone provides some support for his suspicion, although it has less weight than it otherwise might in evaluating the totality of circumstances. See also Sokolow, 490 U.S. at 9-10 (holding that even potentially innocent facts may be factored into totality of circumstances supporting reasonable suspicion).
 
 
 24
 Hudson also relied on Bietry's statement that someone told him that one of the men had a gun. White argues that since no other facts supported an articulable suspicion of any crime, the mere uncorroborated anonymous rumor of a gun passed along by an informant does not justify an investigative stop. The government argues that Bietry was a reliable source relaying recently acquired information. However, although Hudson's testimony effectively establishes Bietry as a reliable source of information, Hudson also was aware that Bietry was relying on hearsay from an undisclosed source.
 
 
 25
 In Adams v. Williams, 407 U.S. 143, 146-47 (1972), the Supreme Court upheld a stop based solely on an uncorroborated tip because the informant's reliability and his presence on the scene "carried enough indicia of reliability to justify the officer's forcible stop...." Id. at 147; see Illinois v. Gates, 462 U.S. 213, 233-34 (1983). The Adams opinion does not disclose whether the officer knew how the informant acquired his information. Although this court has permitted police to rely on tips from other police departments without inquiring as to the primary source of the information, United States v. Troka, 987 F.2d 472, 474 (7th Cir.1993); but see United States v. Ornelas-Ledesma, 16 F.3d 714, 718 (7th Cir.1994) (holding that information provided by federal drug enforcement information system required corroboration due to unknown reliability of both tipsters and managers of system), we have thus far declined to rule on whether a reliable informant's tip based on another unknown source is sufficient by itself to support for a reasonable suspicion. United States v. LeChuga, 925 F.2d 1035, 1038-39 (7th Cir.1991); United States v. Ocampo, 890 F.2d 1363, 1368 (7th Cir.1989). But it is unnecessary to address the issue in this case because other evidence corroborates Hudson's suspicion of criminal activity.
 
 
 26
 In this instance, unlike Adams, 407 U.S. at 147-48, the informant's tip does not provide the sole support for the reasonableness of the officer's suspicion concerning White. Hudson's articulable suspicion is based upon the reported behavior of the four men as a group, the timing of their visit, the suspected gang membership of each man, Hudson's prior experience with prior reports of possession of weapons at that school, and, finally, the report relayed by Bietry that at least one (and therefore possibly all) of the men was potentially armed. See Wheeler, 800 F.2d at 104 (finding that Government bore burden of showing "whether the fact that some [members of a gang] were possibly armed, coupled with the suspicion of a potential violent encounter, could lead to a reasonable inference that they were all possibly armed and dangerous."). The standard for demonstrating reasonable suspicion for an investigative stop is less than either a preponderance of the evidence standard or the "fair probability standard" for probable cause. Sokolow, 490 U.S. at 7. In this case, the district court has not clearly erred by finding that Hudson provided sufficient articulable facts to support his reasonable suspicion that a crime was being or was about to be committed.
 
 
 27
 White contends that the stop and frisk actually constituted an arrest because it exceeded the bounds of an investigative stop. An investigative stop's "scope must be limited, it must be temporary--lasting no longer than necessary, and it must employ the least intrusive means reasonably available to promptly verify or dispel the suspicion." Withers, 972 F.2d at 843. The record indicates that White was stopped for a relatively brief time. White claims that the police arrested him because "[t]he officers did not go to a Terry inquiry/pat down but placed the four men 'in the position'...." (Appellant's Br. at 7.) Given the officers' suspicion that White was armed and dangerous, they could properly ask the suspect to put his hands against a wall or, in this case, a fence. See United States v. Tilmon, 19 F.3d 1221, 1227 (7th Cir.1994) (holding that, when suspect is considered dangerous, "it may even be acceptable to make [the suspect] lie prone on the ground without transforming an investigatory stop into an arrest."). Asking him to "assume the position" did not exceed the bounds of an investigative search.
 
 
 28
 White also erroneously contends that an officer needs to ask questions before he may frisk a suspect for a concealed weapon. An officer may frisk an individual who is reasonably suspected of being armed and dangerous without needing "to ask a question first and possibly 'take the risk that the answer might be a bullet.' " Wheeler, 800 F.2d at 104 (quoting Terry v. Ohio, 392 U.S. 1, 33 (1968) (Harlan, J., concurring)). Thus, the district court did not clearly err by finding that this stop constituted an investigative detention that was properly limited in scope. Given that neither the initial approach by Jones nor the stop and frisk by Hudson and Dickey violated White's constitutional rights, the district court properly denied the motion to suppress.
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 Neither Bietry nor Hudson could recall whether White was one of these two men
 
 
 [2]
 The district court's order indicates that Hudson led Jones to attempt to segregate the men from the crowd of rushing students before Bietry mentioned the gun. This finding of fact is clearly erroneous. United States v. Rice, 995 F.2d 719, 722 (7th Cir.1993) (holding that factual determinations of court on motion to suppress are clearly erroneous when, although there is evidence to support finding, reviewing court is left with definite and firm conviction that mistake has been committed). As the testimony of Jones, Hudson, and Bietry shows, Hudson did not address the suspects and lead the other officers to round up the men until after Bietry mentioned the gun. (Tr. at 10, 13, 18, 27, 55-56, 73-74, 75, 77, 85, 87, 89; but see 62-63). To the extent that the court found that Jones followed Hudson's lead when making initial contact with the two men, that fact is therefore also clearly erroneous
 
 
 [3]
 In line with White's testimony, the district court apparently credits Jones with immediately moving White to the fence. This finding is somewhat at odds with the fact that the court noted Bietry's comment about the gun just before it stated that both officers directed the men to the fence. Furthermore, Hudson testified that he himself stopped White, who was walking south-west on the grass toward the school, and walked White to the fence. Jones also testified that she gave White no commands after asking him to stop. As far as Bietry could recall, Jones ordered one of the men to return the fence, but only after Hudson had reacted to the tip concerning the gun. However, for the purposes of our analysis, we will defer to the district court's finding that Jones initially asked White to move to the fence
 
 
 [4]
 Although White testified that he had already proceeded down the street sidewalk an unknown distance, the district court found that the men were initially walking towards the street on school property when the police arrived. Bietry testified that the school walkway was fifteen yards long and that the two individuals farthest from him were three to four feet from the street sidewalk. (Tr. at 82, 92.) Thus, one can infer that the two men were quite close to the fences, which fit into the corners where the walkway meets the sidewalk. Jones, who could not estimate the length of the walkway, recalled that White was 20 feet from the door as she arrived and that he may have been one of the two men who had already walked past Hudson towards the street. (Tr. at 52, 55.)
 
 
 [5]
 It is unclear whether White bases his claim on Hudson's testimony that after Bietry informed him about the gun, he stopped White and moved him to the fence, or on the theory that Jones had already moved him to the fence when Hudson told Dickey to frisk him. (Id. at 12-13; Reply Br. at 3.) Whether the seizure occurred because Hudson actually stopped him after Bietry informed Hudson about the gun or, as the district court apparently found, simply because Hudson ordered Dickey to search White, the same facts support Hudson's reasonable suspicion. Although we follow the district court's approach, in effect the distinction would not affect the outcome of our analysis
 
 
 [6]
 Hudson confirmed that he had previously dealt with situations at that school where weapons were displayed or where he had been told there were weapons on individuals at the school. He also agreed with the prosecutor's statement that, in Hudson's experience as a police officer, "High School students and people of older ages like the defendant often do carry guns[.]" (Tr. at 23.)
 
 
 [7]
 Hudson was not sure of Hatch's official membership. By this time, Officer Jones knew that another one of the men openly claimed gang membership