TALLMAN, Circuit Judge,
dissenting:
Here we go again. The Supreme Court has told us repeatedly that the Fourth Amendment protects against unreasonable searches and seizures. United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); Ohio v. Robinette, *1177 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). It does not declare inviolate the sanctity of a suspect’s personal security when a police officer has reasonable concerns for his safety. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court recognized that an officer may take reasonable measures to thwart the ability of a suspect deemed to be potentially armed and dangerous from harming the officer or innocent bystanders. Id. at 23, 88 S.Ct. 1868; see also Michigan v. Long, 463 U.S. 1032, 1034, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); United States v. Willis, 431 F.3d 709, 717 (9th Cir.2005); United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1086 (9th Cir.2000); United States v. Portillo, 633 F.2d 1313, 1320 (9th Cir.1980).
The Supreme Court says we must look to the “totality of the circumstances” in order to determine whether the officers’ actions were reasonable under the Fourth Amendment. Robinette, 519 U.S. at 39, 117 S.Ct. 417(stating that “the touchstone of the Fourth Amendment is reasonableness” and “[rjeasonableness ... is measured in objective terms by examining the totality of the circumstances” (internal quotation marks and citation omitted)). The Court unanimously rejected as “contrary to our prior decisions” the “divide- and-conquer” technique employed by the Ninth Circuit in United States v. Arvizu, 232 F.3d 1241 (9th Cir.2000), rev’d, 534 U.S. at 268, 274, 122 S.Ct. 744, to rebuff the officer’s reasonable suspicion. Yet, once again the majority reverts to this discredited device to pick apart every justification for the officers’ actions and declares unconstitutional questions critical to an officer’s safety. In doing so, the majority fails to view the evidence in the light most favorable to the district court’s decision to uphold the seizure of the weapon. See United States v. Harrington, 636 F.2d 1182, 1185 (9th Cir.1980). I respectfully dissent.
I
Terry tells us that we employ a two-pronged analysis to field interviews: (1) is there reasonable suspicion that criminal 18046 activity is afoot to justify further police inquiry, and (2) can the officers articulate reasons to fear the suspect may be armed, thereby justifying action to ensure the officer’s safety. See 392 U.S. at 21-22, 27, 88 S.Ct. 1868. Phoenix Gang Enforcement Detectives Carl Jaensson and Jim Bracke were patrolling an area of high gang activity.[1] The stop occurred at night in a gang neighborhood and Detective Jaensson immediately ordered Mendez out *1178 of the vehicle and patted him down for weapons. Mendez does not challenge the reason for this lawful investigatory stop— he had failed to display a valid Arizona license plate with a current registration tag. Nor does Mendez challenge the lawfulness of this pat-down frisk — the detectives’ testimony that they reasonably feared for their safety was undisputed. It was during the pat-down that Detective Jaensson first noticed a gang-related tattoo located on Mendez’s left hand. Based on his eight years of experience as a gang-enforcement detective, he readily recognized this tattoo as the insignia of a well-known and violent street gang, the Latin Kings.
Although he found no weapons on Mendez’s person, Detective Jaensson did not permit him to return to his vehicle at that time; rather, Detective Jaensson ordered Mendez to sit on the curb while Detective Bracke returned to their police car to run a computer search. When asked at the motion to suppress hearing why he ordered Mendez to sit on the curb, Detective Jaensson answered, “For our safety ... so that [he] would have a harder time getting up and attacking us if that was [sic] to happen.” Mendez does not challenge this decision.
Detective Jaensson knew that the Latin Kings were a Chicago-based gang; yet, Mendez had provided a California identification card, and the car he was driving had an expired temporary registration from Arizona. While awaiting the results of Detective Bracke’s records search, Detective Jaensson asked Mendez where he was from.[2] Rather than responding with a specific location, Mendez told Detective Jaensson that he was from the Latin Kings. Contrary to the majority’s position, the record does not suggest that Detective Jaensson continued to “interrogate” or “question” Mendez about his gang-related activity. Indeed, the majority cannot conclusively state that any one question was unlawful because there is no clear indication from the record as to how the conversation between Detective Jaensson and Mendez proceeded. Detective Jaens-son testified that he had asked Mendez to show him the rest of his tattoos but that he could not recall any specifics from their discussion about those tattoos, other than Mendez telling him that he had left the Illinois gang in “good standing” and that *1179 he was trying to make a life for himself now in Arizona.
When Detective Bracke returned, he overheard Mendez tell Detective Jaensson that he had spent eight years in an Illinois prison. Detective Bracke then asked Mendez, “Why were you in prison?”[3] Once Mendez answered that he was in prison on a weapons violation, Detective Bracke immediately followed up with the question, “Do you have any weapons in your car?”
During the evidentiary hearing on the motion to suppress the gun, Detective Jaensson was asked, “Why was it important to inquire as to whether [Mendez] had a weapon once you had received the information he had given you?” Detective Jaensson gave a common-sense response— for officer safety.
Basically, it’s again for our safety. When Mr. Mendez, if he’s released, if we issue him a citation and he’s upset, if he goes back to his vehicle and there’s a weapon there, we might have a problem with our safety.
Then, when asked by defense counsel whether the weapons-related questions had anything to do with the purpose of the initial traffic stop, Detective Jaensson unequivocally responded, “Yes.” He explained:
Because my policy is I’m going home at night, I want to make sure that me and my partner are going to be safe, and the people that we stop a lot of times will have guns so the bottom line for me is if they have a gun I want to know about it so that I am safe and my partner is safe.
Detective Jaensson’s undisputed testimony was that ensuring officer safety was the sole reason Detective Bracke asked Mendez if he had a weapon in his ear.
Only eight minutes elapsed from the initial stop to the arrest of Mendez for unlawful possession of the firearm. Eight minutes is hardly an unreasonable detention in violation of the Fourth Amendment when there is no challenge to the legitimacy of the initial stop. Yet, the majority finds that safety-related questions prompted by admissions volunteered by Mendez were constitutionally impermissible.
II
The Court’s opinion seeks to pigeonhole the facts of this case into the first prong of the Terry analysis — concerning investigatory stops and limitations on questions related to the purpose of those stops — and ignores any concern over officer safety, undeniably a substantial concern for Detectives Jaensson and Bracke and one which the Supreme Court has repeatedly validated. See, e.g., Long, 463 U.S. at 1049, 103 S.Ct. 3469. The majority concludes that the detectives unlawfully expanded the scope of the initial stop by asking Mendez (1) about his gang-related tattoos, and (2) why he was in prison.[4] The majority’s decision erroneously focuses on its belief that the two factors — gang affiliation and former prison service — did not provide particularized, objective factors suggesting that Mendez was currently engaged in criminal activity. By doing so, *1180 the majority entirely disregards the second prong of Terry and an independent justification for the detectives’ actions: prior gang affiliation and former prison service did give the detectives a reasonable basis to fear for their safety, permitting further inquiry.
The majority relies heavily on our prior decision in United States v. Chavez-Valenzuela, 268 F.3d 719 (9th Cir.2001). There, we held that nervous behavior on the part of a Terry suspect detained for a traffic violation did not give the officer reasonable, particularized suspicion to ask the suspect about possible drug-related activity. Id. at 726. We stated that “[questions asked initially during a traffic stop must be reasonably related to the justification for the stop,” id. at 725 n. 4, and an officer may expand the scope of questioning beyond the stop’s initial purpose “only if he notices particularized, objective factors arousing his suspicion” of criminal activity, id. at 724. However, Chavez-Valenzuela is inapposite to this situation because Detectives Jaensson and Bracke did not expand the scope of the investigatory stop, and, while diligently investigating the unchallenged reason for the stop, the detectives learned facts about Mendez that caused them reasonably to fear for their safety.
The majority’s incongruous conclusion that Detective Jaensson exceeded the limits of his constitutional authority by eliciting information about Mendez’s tattoos is simply unsubstantiated by any Ninth Circuit or Supreme Court authority. First and foremost, the facts that Mendez presented a California identification card rather than a valid driver’s license, was driving a car with an expired Arizona temporary registration tag, and said he was from the Latin Kings, which Detective Jaensson knew to be a Chicago-based gang, is most certainly relevant to the totality of the circumstances analysis. It was reasonable for Detective Jaensson to ask Mendez about his tattoos in order to elicit general information about his gang activity and to try to discern what Mendez was doing in Phoenix that night.
The Fourth Amendment does not require reasonable suspicion to be based solely on factors that directly indicate criminal behavior. Arvizu, 534 U.S. at 273-75, 122 S.Ct. 744; United States v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (“Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion.”); United States v. Michael R., 90 F.3d 340, 346 (9th Cir.1996) (same). Furthermore, the lack of a valid registration also gives rise to a reasonable suspicion that the vehicle could have been stolen. United States v. Fernandez, 18 F.3d 874, 879 (10th Cir.1994) (“[The] lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question ... giv[es] rise to objectively reasonable suspicion that the vehicle may be stolen.”).
At the time of Detective Jaensson’s alleged “interrogation,” Detective Jaensson knew that Mendez was driving a vehicle without license plates and that he was a member of the Latin Kings.[5] These facts support a reasonable suspicion that the vehicle may have been stolen. Cf. United States v. Thompson, 282 F.3d 673, 678 (9th Cir.2002) (finding reasonable suspicion that a vessel may have been stolen when *1181 the defendant was unable to provide a valid registration, the vessel’s registration sticker had expired, and the defendant could not remember the name of the vessel’s owner). Therefore, because Detective Jaensson did have reasonable suspicion that criminal activity could be afoot, any questions he might have asked Mendez in order to elicit information regarding possible gang activity — subsequent to Mendez’s volunteering that he had served a prior prison term — were constitutionally permissible. As such, Detective Jaensson lawfully obtained the information regarding Mendez’s prior prison service.
Moreover, asking the reason for the prison sentence was not improper as the detectives understandably inquired further for their own safety upon learning they had stopped a convicted felon. Under Terry, when an officer has a reasonable basis to fear for his or her safety, the Fourth Amendment does not “deny th[at] officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.” 392 U.S. at 24, 88 S.Ct. 1868. The issue then becomes “whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.” Id. at 27, 88 S.Ct. 1868.
If an officer has a reasonable basis to fear for his safety, he may ask questions to elicit information in an attempt to determine whether the suspect may be armed and dangerous. Willis, 431 F.3d at 717. In Willis, the officer watched as the suspect made a succession of rapid turns, and stopped in front of an apartment building in a high-crime area of Las Vegas. Id. at 712. After the officer ran a check on the suspect’s license plate, he learned that “the car was listed as a ‘suspicious vehicle’ and that there was a National Crime Information Center ... missing person’s report or ‘hit’ associated with the license plate.” Id. The suspect then returned to his car, made an illegal U-turn, and parked in front of another apartment only one or two blocks away; at this point an officer pulled the suspect over. Id. After the suspect nervously exited his car, the officer ordered him to go to the front of the vehicle and asked, “Do you have anything on you I should know about?” Id. The suspect admitted to having a gun in his jacket pocket, id., and we upheld the validity of the investigatory stop and the officer’s questions, id. at 715, 717. We stated that “[o]nce the police stopped [the suspect], they could, within reason, search the area and question[him] about weapons for their own safety.” Id. at 717. We also noted that “[the officer] did not take more extreme measures, but simply asked [the suspect] a question to ensure the officers’ personal safety.” Id.
Even assuming arguendo that gang affiliation and former prison service did not present particularized, objective factors sufficient to raise a reasonable suspicion of current criminal activity in order to justify the question, “Why were you in prison?” knowledge of Mendez’s gang membership and prior weapons conviction surely gave Detectives Jaensson and Bracke a reasonable basis to fear for their safety. Given the time of night and the location of the stop, Mendez concedes that Detectives Jaensson and Bracke acted reasonably by ordering him out of the vehicle and immediately patting him down for weapons. The reasonable fear that caused the detectives to take that approach did not dissipate once they learned that Mendez was a member of the Latin Kings. See United States v. Barboza, 412 F.3d 15, 15-16 (1st Cir.2005) (upholding the legality of a protective search when the officers encountered a “suspected gang member[] on a street ... known for gang violence” and had reason to believe that the suspect was *1182 a “gang-affiliated individual who routinely carried a firearm”); Michael R., 90 F.3d at 346 (“[T]he fact that the young men had haircuts that were characteristic of gang members has evidentiary significance under the totality of the circumstances analysis.”).[6] It was certainly not diminished when Mendez volunteered that he was an ex-convict, having previously served an eight-year prison term in Illinois.
As the Fourth Circuit stated in United States v. Holmes, 376 F.3d 270 (2004), “reasonable suspicion of a suspect’s dangerousness need not be based solely on activities observed by the police during or just before the relevant police encounter, but can be based on the suspect’s commission of violent crimes in the past — especially when those crimes indicate a high likelihood that a suspect will be ‘armed and dangerous’ when encountered in the future.”[7] Id. at 278; see also $109,179 in U.S. Currency, 228 F.3d at 1086(an officer can assume “from the nature of the offense contemplated” that a suspect may be armed and dangerous). This information can only have heightened their suspicion that Mendez might have a weapon in his car, and the Fourth Amendment’s reasonableness requirement demands nothing more. After hearing Mendez admit to gang affiliation and a felony conviction for which he had served eight years in prison, the detectives “could ... question [Mendez] about weapons for their own safety.” See Willis, 431 F.3d at 717.
Detective Bracke did not ask Mendez these questions to investigate ongoing criminal activity; instead, he asked these questions in order to determine whether there was a reason to subject Mendez to a more intrusive safety search — a protective sweep of his vehicle. See Barboza, 412 F.3d at 16(“The purpose of a protective search in the absence of probable cause is not to discover evidence of a crime, but to neutralize the threat of physical harm to police officers and others.”). When an officer believes that a suspect may be armed and dangerous, it is not unreasonable for that officer to “tak[e] preventive measures to ensure that there were no other weapons within [the suspect’s] immediate grasp before permitting him to reenter his auto *1183 mobile.” Long, 463 U.S. at 1051, 103 S.Ct. 3469. As recognized by the Seventh Circuit in United States v. Rainone, 586 F.2d 1132 (7th Cir.1978), there are inherent differences between a Terry stop executed on the sidewalk and one executed while the suspect is in an automobile:
Obviously in a sidewalk encounter with a pedestrian, such as occurred in Terry, the officer’s need to protect himself from dangerous weapons is fully satisfied by a pat-down of outer clothing of the suspect. However, where the suspect is driving an automobile, a pat-down of the outer clothing may not be sufficient to assure the safety of the police officer. In those cases there is the real possibility that a weapon may have been secreted in a part of the automobile readily accessible to the suspect. This is particularly true where the suspect remains in the car, but is also true even where the suspect has been removed from the car. In the latter instance there is still a risk that the suspect may break away or that he may have a motive to kill the officer even after returning to his car. Thus, it is clear that [under] the rationale of Teiry the protection of the investigating officer and others nearby permits the officer to make a search of the automobile, limited to what is minimally necessary to uncover weapons to which the suspect will have easy access.
Id. at 1134-35 (footnotes omitted), cited with approval in Long, 463 U.S. at 1051, 103 S.Ct. 3469(stating that it is not impossible for a “Terry suspect ... [to] break away from police control and retrieve a weapon from his automobile”); see also United States v. Wilkerson, 598 F.2d 621, 625 (D.C.Cir.1978) (“It takes little imagination to realize that an armed suspect might hide his weapon in a car before getting out in response to a police order.”), cited with approval in Portillo, 633 F.2d at 1320.
For these reasons, the Supreme Court has upheld the right of police officers to conduct a limited search of the passenger compartment of an automobile when “the police officer possesses a reasonable belief based on ‘specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant’ the officers in believing that the suspect is dangerous and the suspect may gain immediate control over weapons.” Long, 463 U.S. at 1049-50, 103 S.Ct. 3469(citing Terry, 392 U.S. at 21, 88 S.Ct. 1868). Although Detective Jaensson had already patted Mendez down for weapons, he still posed a threat to the detectives. See Long, 463 U.S. at 1051, 103 S.Ct. 3469; Wilkerson, 598 F.2d at 625; Rainone, 586 F.2d at 1134-35. His answers to Detective Jaensson’s questions — that he was a member of the Latin Kings and that he had served an eight-year prison term — failed to dispel the detectives’ reasonable suspicion that Mendez might pose a danger to the detectives. Cf. $109,179 in U.S. Currency, 228 F.3d at 1086(finding a Terry pat-down to be reasonable because the suspect failed to alleviate the officer’s reasonable belief that the suspect was armed and dangerous during the officer’s initial questioning).
Because it was entirely feasible that Mendez may have concealed his weapon in his car before the detectives approached his vehicle, and because it was always possible for Mendez to break away from the detectives during the investigatory stop for fear that his arrest was imminent or to retaliate upon the issuance of a citation, Mendez’s threat to the safety of Detectives Jaensson and Bracke never abated. Given the totality of the circumstances, and that “investigative detentions involving suspects in vehicles are especially fraught with danger to police officers,” Long, 463 U.S. at 1047, 103 S.Ct. 3469, Detective Bracke’s understandable desire to protect *1184 himself and his partner so they could go home at the end of their shift was nothing but reasonable.[8]
Ill
The majority’s refusal to address the officer safety issue makes no sense in light of the record below. Rather than analyzing this case under both prongs of law announced in Terry and applying the correct analysis dictated in Arvizu, the majority seizes upon a verbal misstep by the government attorney. The approach employed by the majority — limiting its reasonableness analysis to only one justification — is not just another example of what the Supreme Court has unanimously condemned as “divide-and-conquer,” but an even more egregious approach of “divide, conquer, and ignore.”
Contrary to the majority’s position, the government did argue that the detectives’ questions were justified by concerns for officer safety. During oral argument, the government stated, “There was an officer safety concern here.... ” However, before being allowed to finish the answer, the government was pressed by the court with questions regarding whether gang affiliation and former prison service were sufficient to create particularized, objective factors of current criminal activity. In response, the government conceded that those facts would have been the sole basis for the detectives’ decision to expand the scope of the investigatory stop; however, the government never conceded that a reasonable suspicion of current criminal activity was the sole justification for the detectives’ questions. It did try to articulate another justification' — officer safety— before being interrupted by questions from the court.
Moreover, “when reviewing a motion to suppress, the court may affirm on any ground fairly supported by the record.” United States v. Baron, 860 F.2d 911, 917 (9th Cir.1988) (citing United States v. Smith, 790 F.2d 789, 792 (9th Cir.1986)). During the motion to suppress hearing, the government made the following argument:
When we think of Terry we typically think of do the officers have reasonable suspicion to investigate? But there’s more to Terry than that. There is also the officer safety issue.
The measures taken here to ensure that Mr. Mendez was not armed and did not have access to a weapon were clearly reasonable. It [sic] involved questioning, do you have a weapon in the vehicle, after the officers had specific articulable reasons for asking that question.
The Government also raised this argument in its opposition to the motion to suppress. The district court believed that gang affiliation and former prison service were sufficient to raise particularized suspicion of current criminal activity, and, therefore, it did not rule on the officer safety issue. However, this theory is clearly supported by the evidentiary record, was expressly argued before the district court, and we are obligated to address it now. We should not be so quick to conclude that the *1185 detectives’ actions were unconstitutional when it is evident from the record that they acted reasonably to protect themselves under the totality of the circumstances.
rv
The Fourth Amendment does not require police officers to take unnecessary risks in the performance of their duties. Constraining an officer’s ability to make further inquiry into a Terry suspect’s potential dangerousness endangers the officer, his partner, and innocent bystanders, and contravenes established Supreme Court caselaw authorizing the use of reasonable protective measures to ensure officer safety. Two experienced gang-enforcement detectives were confronting a gang member, in a gang neighborhood, who admitted to serving an eight-year prison term on a weapons charge. Faced with such a situation, they made a reasonable decision to make further inquiry into whether Mendez had a gun in his car. The questions they posed were not overly intrusive and were directly related to their legitimate safety concern.
I respectfully dissent.

. During the motion to suppress hearing, defense counsel admitted to the court that the officers had pulled Mendez over in a “gang neighborhood.” The colloquy between the court and defense counsel went as follows:
COURT: I don't think — I'm not sure that the Government even argues this, but if you're on gang duty, as they were, in a gang neighborhood, as they were, and admittedly they make a traffic stop of this type, now they discover that the driver has a gang symbol, volunteers that he came from a gang, doesn’t that — doesn’t that sequence entitle them to expand the scope further on the strength of those two points?
DEFENSE COUNSEL: But expand the scope in what direction? ... You identified the factors immediately, Judge. Th[e]se [are] gang officers patrolling a gang neighborhood, contending that they pulled Mr. Mendez over to investigate his lapsed registration.
In response to this colloquy, the prosecutor followed up by arguing that the detectives' questions were justified by a reasonable concern for their own personal safety. See infra § III.

. Mendez contends that the detectives were not justified in asking him where he was from, and, although the majority does not hold as such, it "doubt[s] that this question was related to the purpose of the stop.” Maj. op. 1167. The Fourth Amendment surely does not prohibit such relevant and innocuous questions when police are investigating a person operating a vehicle in violation of the law and the circumstances show multiple state contacts. The Supreme Court tells us that during even a routine traffic stop an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer’s suspicions.” Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); see also United States v. Hill, 195 F.3d 258, 268 (6th Cir.1999) (holding questions about a driver's "purpose for traveling” were reasonably related to a traffic stop for speeding). Any concern the majority may have over the detectives' subjective intent is misplaced and irrelevant. See Whren v. United States, 517 U.S. 806, 812, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (stating that, in United States v. Villamonte-Marquez, 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), the Court "flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification” in conducting an otherwise valid warrantless search); United States v. Michael R., 90 F.3d 340, 346 (9th Cir.1996) ("Under Whren, [defendant] is precluded from challenging the traffic stop based on [the officer's] subjective intent.”).

. Although the police report suggests that Mendez volunteered the information as to why he was in prison, Detectives Jaensson and Bracke both testified that Detective Bracke may have asked him directly. Because the district court failed to resolve this factual discrepancy, and because the detectives were justified in asking him this question for their own safety in any event, I will assume that Mendez did not volunteer this information.

. I agree that Mendez waived his state law claim by failing to raise it before the district court. Maj. op. 1166 n.9.

. Detective Jaensson testified that at the time of the traffic stop he "could not see a temporary registration tag." The record is unclear as to whether he noticed the expired tag as he approached the car.

. The majority’s reliance on Spivey v. Rocha, 194 F.3d 971 (9th Cir.1999), to support its position that gang affiliation does not raise reasonable suspicion as to whether a suspect may be carrying a weapon is misplaced. There, while reviewing a state court conviction, we held that the trial court’s failure to admit "evidence of [the witness’s] gang affiliation to bolster [the defendant’s] assertion that he armed himself in self-defense” was not constitutional error. Id. at 977-78. We reasoned that "the tendency of members of a gang to carry weapons does not lead reasonably to any inference as to whether a gang member was armed on a given occasion,” and, furthermore, any probative value it may have "was outweighed by the prejudicial effect of admitting gang affiliation.” Id. at 978 (internal quotation marks omitted). Equating the admittance of evidence for the purpose of trial to the circumstances faced by Detectives Jaensson and Bracke in the field — when their personal safety was at stake — is perverse. See United States v. Feliciano, 45 F.3d 1070, 1074 (7th Cir.1995) (recognizing that while gang association has "doubtful evidentiary value” it nonetheless is "a permissible component of the articulable suspicion required for a Terry stop”). Under the totality of the circumstances, it was reasonable for the detectives to fear for their safety. In those circumstances, gang affiliation coupled with an eight-year prison term on a weapons charge supports a reasonable suspicion that a particular individual may be armed and dangerous.

. I note here that Detective Bracke merely asked Mendez why he was in prison, suggesting that Detective Bracke's intent was not to investigate current criminal activity, but to gauge the safety threat posed by Mendez to the detectives based on their understandable desire to know more about the formerly imprisoned person with whom they were dealing.

. Because the detectives’ actions were justified and reasonable, Mendez's argument that the detectives unlawfully prolonged the stop is meritless. See United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (“In assessing whether a detention is too long in duration to be justified as an investigative stop, ... it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.”). Detectives Jaensson and Bracke were diligent in their investigation, as evidenced by the fact that only eight minutes had passed between the initial stop and Mendez's arrest.