# United States Court of Appeals
## For the First Circuit

No. 11-1764

UNITED STATES,

Appellee,

v.

ANTHONY JONES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Howard, Ripple,* and Selya, Circuit Judges.

Stuart W. Tisdale, Jr. for appellant.
Renee M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty, II, United States Attorney, was on brief for
appellee.

December 5, 2012

---

* Of the Seventh Circuit, sitting by designation.

**RIPPLE, Circuit Judge**. Anthony Jones was indicted on one count of possessing five or more grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1). After his motion to suppress evidence was denied, he entered a conditional plea of guilty. See Fed. R. Crim. P. 11(a)(2). Mr. Jones was sentenced to 180 months' imprisonment.[1] He now timely appeals the denial of his suppression motion as well as the use of certain prior convictions in calculating his sentence guideline range.[2]

## I

## BACKGROUND

On May 29, 2008, Agent Ernest MacVane, assigned to a Drug Enforcement Administration ("DEA") task force, received an anonymous call from an individual who claimed to have used cocaine and to have purchased it recently at a house located at 31 Saugus Street in Portland, Maine. In the course of the call, the individual supplied the following details. A red and black Saab or Audi located at that address was associated with drug sales. Five individuals were at the address: Maria Strong and four African-American males from Massachusetts. Two of the males were armed with handguns. The four men used the house to store drugs

---

[1] The district court's jurisdiction was predicated on 18 U.S.C. § 3231.

[2] Our jurisdiction is predicated on 28 U.S.C. § 1291. See United States v. Dubose, 579 F.3d 117, 119 (1st Cir. 2009); United States v. Jackson, 544 F.3d 351, 356 (1st Cir. 2008).

and money, and the caller had seen about one ounce of crack cocaine while in the house. A silver car parked on an adjacent street contained a large quantity of cocaine base.[3]

On the same day, Agent MacVane went to the address to corroborate the information. The car in the driveway matched the caller's description and a silver Toyota with Massachusetts plates was parked on a cross street within view of the back of the house. By conducting a records search, Agent MacVane learned that the silver Toyota belonged to Lemmie Nunes. Agent MacVane knew that, two weeks before receiving the caller's tip, agents had arrested Kamaludin Odowa for distributing drugs out of a motel room which had been rented by Nunes. Officers recovered cocaine and money from Odowa, but Nunes had not been arrested.[4] A records check further confirmed that Maria Strong lived at 31 Saugus Street. Two years earlier, Strong had been arrested in a case in which Agent MacVane had seized four to five ounces of crack cocaine from her companion. Strong herself never was charged in connection with that incident.[5]

A drug-sniffing dog and its handler were dispatched to the scene. The handler, posing as a resident walking his dog,

---

[3] R.87 at 3-4.

[4] R.87 at 4; R.93 at 210-11.

[5] R.87 at 4; R.93 at 249-50.

walked past the Toyota two times but did not circle it. The dog did not alert on the car.

While agents observed the location, an African-American male left the house, went to the silver Toyota and drove the short distance back to 31 Saugus Street where three other males, two African-American and one Caucasian, got into the car and the vehicle drove off. When the vehicle pulled into a gas station, it was surrounded quickly by four law enforcement vehicles. Five agents participated in the stop. All wore civilian clothes with their badges displayed. Two agents, wearing vests that said "police," approached the Toyota with guns drawn. The agents testified that they considered the operation to be "high risk" because the caller had indicated that at least two of the individuals were armed. Each agent was tasked with detaining one of the Toyota's occupants. Agent MacVane was assigned to detain Mr. Jones who was sitting in the front passenger seat. He approached Mr. Jones with his gun drawn, shouted "police" and ordered Mr. Jones to put his hands up. When Mr. Jones did not raise his hands, Agent MacVane opened the car door and repeated the instructions. Mr. Jones did not comply and instead moved his right hand behind his back and towards his waist.[6] Fearing Mr. Jones had a weapon, Agent MacVane kicked Mr. Jones in the chest and grabbed his arm to pull him out of the vehicle. Because Mr. Jones was

---

[6] R.87 at 6.

-4-

still not compliant, Agent MacVane called for help.  He got Mr. Jones out of the car and put him face down on the pavement. Agents David Bruni and Paul Wolf came to assist.  Agent MacVane struck Mr. Jones's shoulder at least twice in an attempt to get his cooperation.  With the help of the other agents, Mr. Jones eventually was restrained by linking two sets of handcuffs.  The agents testified that they did not hear Mr. Jones complain of breathing difficulties, but Mr. Jones testified that he repeatedly yelled that he was unable to breathe.  Only twenty to thirty seconds elapsed from the time Mr. Jones saw Agent MacVane to when Mr. Jones was handcuffed.

Once Mr. Jones was secured, Agent Bruni conducted a visual search for weapons and noticed that Mr. Jones's pants had slid down around his buttocks and the corner of a plastic bag was sticking out of the waistband of his underwear.  Agent Bruni had seen other suspects hide drugs in this manner, and, based on his experience, he believed the plastic bag in Mr. Jones's underwear contained drugs.  Agent Bruni pointed out the bag to Agent MacVane and removed it.  The bag, weighing 46.8 grams, contained thirty-six smaller bags of cocaine base.  An ambulance was called for Mr. Jones because he was having difficulty breathing.[7] Agent MacVane accompanied Mr. Jones to the hospital and testified that, at one point, Mr. Jones's pants slipped down again and

_____

[7]  R.87 at 8.

Agent MacVane had to pull them up because Mr. Jones was still handcuffed. No other drugs were found at the scene, and the vehicle's other occupants were released.

In contrast to the agents' testimony, Mr. Jones testified that his pants did not slip down during the incident and that he felt someone pull at the top of his pants, reach into his underwear, and pull out the package of crack cocaine from "really down deep between [his] buttocks."[8] He and his girlfriend, Melissa Roman, testified that Mr. Jones's pants fit well and could not slip down because he wore a belt.[9] Mr. Jones also testified, however, that he could retrieve the cocaine by reaching his own arm down his pants without loosening his belt.[10]

## II

## DISCUSSION

### A.

We turn first to Mr. Jones's contention that the district court erred in denying the motion to suppress. He presents several arguments to support this contention. First, he maintains that the agents did not have reasonable suspicion to stop the silver Toyota. Second, he contends that, even if there were reasonable suspicion

---

[8] R.94 at 148.

[9] R.87 at 12-14.

[10] R.87 at 15.

to conduct the stop, the seizure was a de facto arrest because the agents' conduct exceeded the scope necessary to conduct an investigatory stop and therefore had to be based on probable cause, not reasonable suspicion. Third, Mr. Jones asserts that the district court's factual finding, that agents saw a corner of the plastic bag and did not reach into Mr. Jones's pants, was clearly erroneous. We shall address each of these contentions.

**1.**

In the district court and now before this court, the Government justifies the initial stop of the vehicle on the ground that, at the time the stop was made, the agents had an adequate basis to conduct such an investigative stop. We therefore begin by setting forth the established principles that govern investigative stops.

The stop of an automobile and the detention of its occupants constitutes a seizure under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979). To satisfy the requirement of the Fourth Amendment that all such seizures be "reasonable," U.S. Const. Amend. IV, police officers conducting an investigatory stop must have "reasonable suspicion." They "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," justify an intrusion on a private person. Terry v. Ohio, 392 U.S. 1, 21 (1968). Officers' "hunches"

are insufficient for reasonable suspicion. Id. at 22. In determining whether an officer had reasonable suspicion, we look to the facts "available to the officer at the moment of the seizure or the search." Id. We must assess the "totality of the circumstances." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). See also United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006). Although reasonable suspicion requires a "lesser showing" than probable cause, we focus on the same factors. Alabama v. White, 496 U.S. 325, 328-29 (1990). As the district court recognized, we summarized these principles in United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001):

> Reasonable suspicion, as the term implies, requires more than a naked hunch that a particular person may be engaged in some illicit activity. By the same token, however, reasonable suspicion does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime. Reasonable suspicion, then, is an intermediate standard--and one that defies precise definition. Its existence must be determined case by case, and that determination entails broad-based consideration of all the attendant circumstances. In mulling those circumstances, an inquiring court must balance "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." To keep this balance true, the court must make a practical, commonsense judgment based on the idiosyncracies of the case at hand.

(citations omitted).

Assessing information provided by third parties has long been a subject of litigation, and the basic principles governing this particular inquiry also are well established. Information provided to police by third parties may create reasonable suspicion if the information contains sufficient "'indicia of reliability.'" White, 496 U.S. at 328. The past reliability of an informant is a significant factor permitting reliance on information that would not otherwise be sufficiently corroborated. See United States v. Taylor, 985 F.2d 3, 5-6 (1st Cir. 1993) (noting that an informant's detailed, first-hand description of the area and a statement as to the informant's past reliability was sufficient to support a warrant). Anonymous tips, such as the one at issue here, present special problems and require particular caution on the part of both law enforcement agents and reviewing courts. In Florida v. J.L., 529 U.S. 266 (2000), the Supreme Court stated succinctly the reason for this caution:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.

Id. at 270 (citations omitted) (internal quotation marks omitted). Therefore, when, as here, the information comes from an anonymous informant, law enforcement authorities must take steps to

corroborate the information.[11]  In this context, courts have long recognized that a tip predicting future behavior, not known to the general public, may be worthy of significant weight to the extent that it demonstrates that the informant has some inside information or familiarity with the defendant's affairs.  White, 496 U.S. at 332.  Ascertaining by investigation that the person implicated by the tip has a relevant criminal history is helpful, although not sufficient in itself, to create reasonable suspicion.  Monteiro, 447 F.3d at 47 (noting that corroboration may "come[] in part from an individual's gang affiliation and/or recent arrests for conduct related to the activity referred to in a tip").

"Corroboration of apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip." United States v. Greenburg, 410 F.3d 63, 69 (1st Cir. 2005) (citing Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983)).  However, because a determination of reasonable suspicion must be based on the totality of the circumstances, both law enforcement and reviewing courts must take into consideration the facts that suggest the tip was reliable and those that indicate a lack of

---

[11]  Alabama v. White, 496 U.S. 325, 331–32 (1990) (justifying a Terry stop with an anonymous tip that was corroborated by specific details and predictive information); United States v. Monteiro, 447 F.3d 39, 44-46 (1st Cir. 2006) (discussing the legal requirements and need to corroborate information from anonymous callers).

reliability.  Monteiro, 447 F.3d at 46.[12]  The reliability of an anonymous source may be undermined when police attempts to corroborate instead disprove information provided by the anonymous source.[13]

With these basic principles in mind, we turn to the case before us today.  As we already have noted, the tip in this case was from an anonymous informant.  Much of the information conveyed in the tip was easily ascertainable by a third party with no particular information about the concealed criminal activity of the persons implicated by the tip.  This information, standing alone, cannot support a determination of reasonable suspicion.  As the Supreme Court noted in J.L., to support a determination of reasonable suspicion, the tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."  529 U.S. at 272.  Some of the information supplied by the informant did provide information responsive to this requirement. First, it provided information about the illegal activity that was

---

[12]  The court in Monteiro did note that the situation may be different when there is an imminent threat to public safety, but in that case, a week had passed since the alleged shooting, police had discredited the information, and police did not have any reason to suspect that the vehicle posed a current threat to the public. 447 F.3d at 49.

[13]  For instance, the anonymous source in Monteiro, 447 F.3d at 43-44, told police investigating a shooting on Eastman Street that a vehicle with a particular license plate had been involved in a shooting on Shirley Street, but police attempts to investigate a shooting on Shirley Street suggested that no such shooting had occurred.

taking place at the house in question and further stated the basis for that knowledge. Specifically, the informant reported that he had purchased contraband drugs at the home. Second, the informant stated a specific connection between the occupants of the house and the silver Toyota parked in the area. The informant stated that the vehicle was owned by an occupant of the house and was used to store drugs. This information would not be available to the casual third-party observer.

The agents correctly did not act immediately on this information, but first set out to corroborate it. They met with mixed success. They independently verified, through motor vehicle records, the location of the home and that Maria Strong lived at that address. They also verified that the silver Toyota was parked at a location, in the words of the district court, "unusually far from 31 Saugus Street, but not unusually so if it was being used by drug traffickers who would want to keep the car from being associated with 31 Saugus Street while keeping it visible from that house."[14] On the other hand, a dog trained to alert in the presence of drugs did not do so when walked by the silver Toyota during an atypical canine search.[15]

---

[14]  R.87 at 4.

[15]  Agent MacVane's original affidavit did not indicate that the canine search was limited, R.93 at 253-54, but during the suppression hearing he testified that the sniff in this case was unusual because the handler was not in uniform and the dog did not circle the car. R.93 at 214-15. We also note that, in any event,

The agents independently ascertained that the occupant of the house, Maria Strong, had been connected to drug activity (although never charged) two years earlier. They also ascertained that the owner of the silver Toyota was Nunes, who rented a motel room used in another drug trafficking case two weeks before Agent MacVane received the informant's tip. Both cocaine and money had been discovered in the course of that arrest. Continued surveillance permitted the agents to observe an African-American male leave the house on Saugus Street, get into the silver Toyota around the corner and drive around the block to the Saugus Street address. This observation provided independent corroboration of the connection of the silver Toyota to the house. Notably, however, the later observation of three men entering the car demonstrated that the informant's report that all four men were African-American was not entirely correct since one of them was Caucasian.

In the end, by the time the agents stopped the silver Toyota and its occupants, they had established that a person connected to a drug transaction in the past had within her house four individuals, one of whom had rented a room occupied by a

---

the failure of the dog to alert does not vitiate reasonable suspicion. It was simply a factor for the district court to consider. See United States v. Jodoin, 672 F.2d 232, 236 (1st Cir. 1982), abrogated on other grounds, Bloate v. United States, 130 S. Ct. 1345 (2010); see also United States v. Ramirez, 342 F.3d 1210, 1213 (10th Cir. 2003).

person recently arrested in a drug transaction. They also had observed the silver Toyota parked in a manner that was compatible with the drug storage reported by the informant. That use had not been confirmed, however, during a walk-by examination by a drug-sniffing dog. They also knew that the informer had been wrong with respect to the race of one of the men.

We must now assess whether, at the moment that the silver Toyota was stopped, all these circumstances would warrant a person of "reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 22 (internal quotation marks omitted). Although the case is admittedly a close one, we believe that the district court correctly determined that the agents acted within the confines of existing law. As a threshold matter, we point out that the district court correctly understood and articulated the governing principles of law. Most importantly, the court understood the importance of the agents obtaining sufficient corroboration of the anonymous tip and specifically pointed out that, unlike the tip in J.L., the information described here included the basis of the informant's information and permitted at least a partial corroboration of the informant's account. The agents were able to verify that a connection existed between the house at 31 Saugus Street and the silver Toyota, and that the house and the car were occupied and owned by individuals earlier implicated in the very illegal activity that the informant had

described, to his own potential detriment, as taking place in the house. We believe that this information would permit a reasonable drug enforcement agent to suspect, in light of his experience, that criminal activity was underway and that further inquiry of those suspected was required. Under these circumstances, the agents were permitted to stop the silver Toyota.

2.

Having determined that there was reasonable suspicion to stop the vehicle in which Mr. Jones was a passenger, we must now examine whether the agents' actions exceeded the scope of a permissible Terry stop. Like the determination of whether reasonable suspicion exists, assessment of whether the agents exceeded the permissible scope of intrusion is a difficult, fact-intensive inquiry. United States v. Young, 105 F.3d 1, 7 (1st Cir. 1997) ("Parsing whether any given seizure constitutes an arrest or a lesser seizure, however, proves a difficult task."); United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) ("There is no scientifically precise formula that enables courts to distinguish between investigatory stops, which can be justified by reasonable suspicion, and other detentions that the law deems sufficiently coercive to require probable cause--detentions that are sometimes called 'de facto arrests.'").

At the outset, we have held that a de facto arrest occurs when "'a reasonable man in the suspect's position would have

understood his situation,' in the circumstances then obtaining, to be tantamount to being under arrest." Zapata, 18 F.3d at 975. However, in making this assessment, we also must keep in mind that police conducting a Terry stop are entitled to take reasonable measures to protect their own safety and taking such measures does not transform a Terry stop into an arrest. See United States v. Chaney, 647 F.3d 401, 409-10 (1st Cir. 2011) (noting circumstances that may justify officer action); United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991) (stating that "[an officer's] concerns for his own safety [are] of paramount importance in assessing the appropriateness of the action taken"). We must take an objective look at the totality of the circumstances and assess "the reasonableness of the detaining officer or officers' actions in response to developing conditions." Chaney, 647 F.3d at 409. Thus, measures such as the use of handcuffs,[16] drawn weapons,[17] placing suspects face down on the ground,[18] the presence of multiple

---

[16] United States v. Chaney, 647 F.3d 401, 409 (1st Cir. 2011) (noting that while handcuffs and drawn weapons suggest de facto arrest, neither factor alone is determinative).

[17] Id.; United States v. Taylor, 162 F.3d 12, 21 (1st Cir. 1998) (holding that no de facto arrest occurred when at least one officer had a drawn weapon).

[18] Taylor, 162 F.3d at 21-22 (determining that no de facto arrest occurred even though occupants of the car claimed that they "were placed face-down on the ground and pat-frisked").

officers,[19] and police cruisers positioned to block exits,[20] do not necessarily turn a stop into a de facto arrest.

The situation that confronted us in <u>United States</u> v. <u>Taylor</u>, 162 F.3d 12 (1st Cir. 1998), is fairly analogous to the stop involving Mr. Jones and, consequently, it provides us with significant guidance in resolving this case. In <u>Taylor</u>, police learned from an informant that two individuals, armed with handguns, were delivering drugs in a brown Acura. <u>Id.</u> at 15. Based on the tip, three police cruisers converged on the suspects' car while it was stopped at a red light. One officer drew his weapon and ordered the driver to turn off the engine while other officers removed the vehicle's three occupants, placing them face-down on the ground and frisking them for weapons. Ten to twelve officers and an unknown number of police vehicles eventually reported to the scene. <u>Id.</u> at 16, 21. Noting that the police reasonably believed the suspects were potentially very dangerous, we held that no de facto arrest had occurred. The officers "were entitled 'to take swift measures to discover the true facts and

---

[19] <u>Id.</u> (holding that no de facto arrest occurred when there were ten to twelve officers on the scene and the egress was blocked by police cruisers); <u>United States</u> v. <u>Quinn</u>, 815 F.2d 153, 156–58 (1st Cir. 1987) (holding that no de facto arrest occurred where police cruisers blocked suspect's egress, five officers were present, and interrogation took twenty to twenty-five minutes).

[20] <u>See</u> <u>supra</u> note 19.

-17-

neutralize the threat of harm if it materialized.'" Id. at 21 (quoting Terry, 392 U.S. at 30).

Here, as in Taylor, it was reasonable for the DEA agents to believe that the stop was a "high risk" operation involving armed drug traffickers. As we have noted earlier, our cases make clear that officer safety is paramount and, when reasonably necessary based on information available to law enforcement, police officers may use multiple vehicles, multiple officers, handcuffs and drawn weapons without turning a Terry stop into a de facto arrest.[21] The district court correctly determined that the stop was not a de facto arrest.

### 3.

We next turn to the district court's finding that the agents saw the drugs in plain view. On a motion to suppress, "[t]he district court's credibility findings should be accorded deference and overturned only if [we have] a definite and firm conviction that a mistake has been committed." United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003).

Here, the district court found that the testimony of Agents MacVane and Bruni was more credible than the testimony of Mr. Jones and his girlfriend, Ms. Roman. The agents testified that Mr. Jones's pants had slid down below his buttocks and a portion of a knotted plastic bag could be seen sticking out of his underwear.

---

[21] See supra notes 16-19.

In contrast, Mr. Jones testified that he felt an agent reach down his pants and pull the bag of cocaine from between his buttocks. In deciding that the agents were more credible, the district court doubted the testimony of Mr. Jones and Roman that Mr. Jones's pants fit firmly around his waist because Mr. Jones testified that he retrieved the cocaine by reaching his own arm into his pants without loosening his belt.[22]

Mr. Jones argues that the district court's finding was clearly erroneous because Agent Wolf, the supervising agent who also assisted in securing Mr. Jones, testified that he did not see the bag, and thus the bag must not have been visible to the other two agents. This testimony does not necessarily contradict the other agents' testimony because Agent Wolf left as soon as Mr. Jones was secure and Agent Bruni spotted the bag only after conducting a visual search for weapons.

---

[22] R.87 at 12-14, 25-26. The district court additionally noted some conflict between what Mr. Jones told Officer Duff on May 30, 2008, and Mr. Jones's and Roman's testimony at the suppression hearing on November 13, 2008, including whether Mr. Jones and Roman were still together and where Mr. Jones was during the three days prior to May 29. Roman testified that she and Mr. Jones were together at the time and that he was with her during the three nights before May 29. She later testified that he was not with her on May 28. Mr. Jones initially told Officer Duff that he was staying at 31 Saugus Street because he and Roman recently had separated. R.87 at 12, 14-15.

**4.**

In summary, we hold that the police had reasonable suspicion to stop the vehicle in which Mr. Jones was riding. We further hold that the manner in which the agents conducted the stop was reasonable in light of their legitimate safety concerns and, therefore, the stop did not escalate into a de facto arrest. The district court's finding that the drugs on Mr. Jones's person were in plain sight is not clearly erroneous. The motion to suppress the evidence was correctly denied.

**B.**

Mr. Jones also challenges three decisions related to his sentence. First, Mr. Jones asserts that the district court erred in determining that his 1997 conviction for assault and battery of a police officer ("ABPO") under Massachusetts General Laws chapter 265, § 13D was a "crime of violence" for purposes of a career offender determination. Next, Mr. Jones maintains that his 1997 felony drug conviction is too old to be counted as a career offender predicate. Finally, Mr. Jones argues that his sentence should not have been enhanced under 21 U.S.C. § 841(b)(1)(B)(iii) because the existence of the 1997 drug conviction was not proven "beyond a reasonable doubt." We address each of these arguments in turn.

**1.**

Mr. Jones first argues that his conviction for ABPO should not have been used in determining his career offender status because it is not a "crime of violence." U.S.S.G. § 4B1.1. "Whether a prior conviction qualifies as a predicate offense under U.S.S.G. § 4B1.1 is a question of law that we review de novo." United States v. Almenas, 553 F.3d 27, 31 (1st Cir. 2009).

Mr. Jones asserts that his conviction for ABPO cannot be counted because the statute of conviction is a general prohibition on assault and battery of any public employee. As a general prohibition, the statute includes offenses which are no more than offensive touching in addition to those which involve a "serious potential risk of physical injury to another" as required by U.S.S.G. § 4B1.2(a). In the alternative, Mr. Jones argues that the charging document was deficient because, although it alleges that Mr. Jones "did assault and beat Ptl. K. Lavita, a police officer," it does not allege that Mr. Jones <u>knew</u> that Officer Lavita was a police officer.

We have rejected both arguments in previous opinions. In United States v. Sumrall, 690 F.3d 42, 43 (1st Cir. 2012), we emphasized that it is settled law that "all of the branches of the statute," including recklessness, qualify as a crime of violence under U.S.S.G. § 4B1.2(a). We relied upon United States v. Dancy, which noted that the additional elements required for

-21-

Massachusetts' ABPO statute "ensure that the conduct criminalized by the ABPO statute is 'purposeful.'" 640 F.3d 455, 468 (1st Cir. 2011) (citing Mass. Gen. Laws ch. 277, § 79).

As to the knowledge requirement, although the indictment does not allege that Mr. Jones knew that the victim was a police officer, we previously have stated that, in Massachusetts, conviction for APBO does require knowledge of the victim's status as a police officer. See Sumrall, 690 F.3d at 44; Dancy, 640 F.3d at 468 n.13 (citing Commonwealth v. Francis, 511 N.E.2d 38, 41-42 (Mass. App. Ct. 1987); Commonwealth v. Rosario, 430 N.E.2d 866, 866 (Mass. App. Ct. 1982)); see also Commonwealth v. Deschaine, 932 N.E.2d 854, 860-61 (Mass. App. Ct. 2010), rev. denied, 936 N.E.2d 434 (Mass. 2010). Thus, the fact of conviction establishes both that Mr. Jones assaulted a police officer and that he knew the victim was a police officer. "Because knowledge is an element of ABPO, any professed lack of knowledge is, therefore, at most, the basis for a collateral claim that must be raised in a state, not a federal, court." Sumrall, 690 F.3d at 44. The district court correctly included Mr. Jones's conviction of ABPO in determining his status as a career offender.

**2.**

Mr. Jones next submits that his 1997 state drug conviction is too old to be considered in determining his status as a career offender. The applicable time period is a legal

-22-

determination of the Guidelines' meaning and scope that we review de novo.  See United States v. Bryant, 571 F.3d 147, 153 (1st Cir. 2009).

Mr. Jones was convicted and sentenced for a felony drug offense on December 17, 1997, approximately ten years and five months before the "commencement of the instant offense."  U.S.S.G. § 4A1.2(e).  Initially, all but three months of the sentence were suspended, but Mr. Jones violated probation and, in April 1998, he was ordered to serve the remaining fifteen months.  Mr. Jones argues that, because he initially only served three months of his eighteen-month sentence, the underlying conviction cannot be counted because it was more than ten years before the commencement of the current offense.  He argues that § 4A1.2(k)(1) (requiring the sentencing court to combine the original sentence to any sentence imposed after a probation violation) applies only to computing the criminal history points and not for determining whether a conviction should be included in a career offender calculation.  We cannot accept this argument.

Under U.S.S.G. § 4A1.2(e), a conviction that occurred more than ten years before the instant offense is not counted if the resulting sentence was thirteen months or less.  If the sentence was over thirteen months, the conviction is counted if it was imposed or resulted in the defendant's being incarcerated within fifteen years of the instant offense.  Id.  Under

§ 4A1.2(k)(1), if the defendant violated probation and received an additional sentence, the length of the sentence is determined by "add[ing] the original term of imprisonment to any term of imprisonment imposed" as a result of the probation violation. "The resulting total is used to compute the criminal history points," U.S.S.G. § 4A1.2(k)(1), but, like other definitions in § 4A1.2, it is also used in making career offender determinations. See U.S.S.G. § 4B1.2 cmt. 3 ("The provisions of § 4A1.2 (Definitions and Instructions for Computing Criminal History) are applicable to the counting of [career offender] convictions under § 4B1.1."); United States v. Van Anh, 523 F.3d 43, 61 (1st Cir. 2008) ("[T]he career offender guidelines treat sentences imposed pursuant to a revocation of parole as part of the original sentence." (citing U.S.S.G. § 4A1.2(k)(1))).

Applying these rules to Mr. Jones's case, we determine the appropriate application period by combining the portion of Mr. Jones's sentence that was not suspended (three months) with the sentence that was imposed after he violated probation (fifteen months) for a total of eighteen months. Because the total sentence for the 1997 drug conviction was over thirteen months, the fifteen-year application period applies and the district court properly considered the conviction in determining Mr. Jones's career offender status.

**3.**

Mr. Jones's final argument is that his sentence should not have been enhanced under 21 U.S.C. § 841(b)(1)(B)(iii) because the evidence was insufficient to prove the existence of the 1997 felony drug conviction beyond a reasonable doubt, as required by § 851(c).

A defendant convicted of possessing twenty-eight or more grams of a substance containing cocaine base under 21 U.S.C. § 841(a)(1) is subject to a statutory minimum sentence of ten years if he has a prior felony drug conviction.[23]   See 21 U.S.C. § 841(b)(1)(B).  The Government is required to file an information giving notice of the prior convictions to be relied on, and if the defendant denies the prior conviction, the sentencing court must hold a hearing.   Id. § 851(a)-(c).   During the hearing, the Government has the burden of proving any factual disputes related

---

[23]   Mr. Jones committed the offense in 2008.  The district court ruled on the issue of enhancement under § 841(b)(1)(B) in November 2009, prior to enactment of the Fair Sentencing Act of 2010, which increased the amount of cocaine needed to trigger the ten-year minimum for prior offenders from five grams to twenty-eight grams.  The parties apparently did not revisit the issue when Mr. Jones was sentenced in June 2011; however, the change applies to defendants whose crimes preceded the effective date of the Act.  See Dorsey v. United States, 132 S. Ct. 2321, 2335 (2012).  Although the indictment alleged only that Mr. Jones possessed "five grams or more," he agreed in his sentencing memorandum and briefs that the drug quantity is 46.8 grams of cocaine, thus he still qualifies for the enhancement.

to the prior conviction "beyond a reasonable doubt." 21 U.S.C. § 851(c).[24]

Here, the Government timely filed an information listing the 1997 felony drug conviction. During a pre-sentencing hearing, the Government presented certified records from Massachusetts state court, which included an indictment and computer docket sheet showing Mr. Jones's guilty plea, sentence and revocation of probation. There were two sets of certified records, presumably because the Government sent two separate requests. Each set of records was in a blue folder with Mr. Jones's name and the case number on the outside, but one folder listed the date as December 1997 with Associate Justice James D. McDaniel presiding, while the other folder had an April 1998 date with Regional Administrative Justice Elizabeth B. Donovan presiding. Mr. Jones agreed that the documents were a true copy of Massachusetts court records, he agreed that he was the person listed in the court documents as being convicted in 1997, and he presented no evidence contradicting the records. Mr. Jones initially stated that he did not deny the fact of the conviction, but after conferring with counsel, stated

---

[24] The statute does not require proof beyond a reasonable doubt unless there is a factual dispute, and it is not at all certain that a factual dispute actually exists here. During a colloquy with the court, Mr. Jones agreed that he had been convicted in 1997, but, after a discussion with counsel he stated that he denied the conviction "on a legal basis," not on a factual basis. R.209 at 5-6.

that he denied his conviction "on a legal basis."[25]  Mr. Jones's counsel argued that, although the records were true copies, the Government's evidence was insufficient because there were few records from the court, the folders contained different dates, and there was no certification that the records were correct.  Defense counsel did not dispute that they were true copies, but suggested that there could have been a mistake in the court's records or that the records could have been affected by a computer virus.[26]

The district court held that the discrepancy did not undermine the accuracy of the records because the blue cover folders were not part of the certified documents and it was apparent that in one case the person preparing the folder used the date of Mr. Jones's original guilty plea while the person preparing the folder to respond to the second request used the date on which Mr. Jones was resentenced after he violated probation.[27]

Mr. Jones now argues that the records were insufficient to prove the conviction beyond a reasonable doubt because:  (1) the documents were not certified by one having personal knowledge of the conviction; (2) the certification does not individually list every document in the file; and (3) there are discrepancies in the documents.  Appellant's Br. 55-57.  These arguments fail.

---

[25]  R.209 at 5-6.

[26]  R.209 at 30, 32-34.

[27]  R.153 at 5-6.

A prior conviction can be proved through a variety of documents, including "certified convictions or other comparable judicial records that detail the fact of conviction," Bryant, 571 F.3d at 155, or even a printout of an electronic docket, United States v. McKenzie, 539 F.3d 15, 19 (1st Cir. 2008). Although most cases addressing this issue involve sentencing where the standard of proof is a preponderance of the evidence, such records also can be used to prove the existence of a conviction beyond a reasonable doubt, as required by the statute at issue here. Courts regularly rely on other courts' records, and we know of no case requiring the record to be certified by one with personal knowledge of the actual proceedings. Such a requirement would require federal courts to subpoena the prosecutors, defense counsel, judges or court clerks that were actually present in the prior proceeding--an undue and unnecessary burden.

Nor do the cases require that the certification individually list every document in the file. The cases cited by Mr. Jones do not suggest otherwise. Bryant, 571 F.3d at 153, involved a situation where the Government failed to provide any judicial record showing the fact of conviction, and United States v. Kellam, 568 F.3d 125, 144-45 (4th Cir. 2009), involved court records that did not clearly identify the defendant. Neither situation is present here.

Mr. Jones's third challenge to the certified records has more potential, but it also fails. Discrepancies in certified documents could raise doubts as to the defendant's identity, see id. (noting discrepancies and missing information in the conviction records, such as different name spellings and redacted personal information), and conceivably, under certain circumstances, could raise doubts as to the type of crime in the prior conviction. Here, however, the district court was correct that the "discrepancy" in the cover folders did not create a reasonable doubt as to the fact of Mr. Jones's conviction. The cover folder is not part of the certified record and, even if it were, the different dates on the cover folders correspond to the dates of Mr. Jones's initial conviction and resentencing.

Mr. Jones argues for the first time on appeal that the records cannot be believed because the indictment charges a violation of chapter 94C § 32A(c) while the docket reflects a violation of chapter 94C § 32A(a). Failure to raise an argument to the district court may constitute waiver, precluding our review; it also may result in forfeiture, where review is only for plain error. See United States v. Morgan, 384 F.3d 1, 7-8 (1st Cir. 2004). In the latter situation, Mr. Jones bears the burden of proving "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public

-29-

reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). See also United States v. Ahrendt, 560 F.3d 69, 76 (1st Cir. 2009). Mr. Jones has not addressed these requirements, but even if he had, we would not conclude that the district court committed plain error. The "discrepancy" does not necessarily make the documents unreliable, cf. United States v. Sanders, 470 F.3d 616, 623-24 (6th Cir. 2006) (holding that discrepancies in court documents, listing the charge as robbery, aggravated robbery, and burglary, did not make the documents unreliable), nor does it cast doubt on whether Mr. Jones has a prior felony drug conviction. Section 32A(a) prohibits "manufactur[ing], distribut[ing], dispens[ing], or possess[ing] with intent to manufacture, distribute or dispense a controlled substance in Class B of section thirty-one." Mass. Gen. Laws ch. 94C § 32A(a). Section 32A(c) prohibits identical conduct related to phencyclidine and a subgroup of controlled substances listed in the same "Class B of section thirty-one." Id. § 32A(c). Thus, depending on the substance involved, Mr. Jones could have been charged under either or both statutes, and a conviction under either statute would qualify him for an enhancement under 21 U.S.C. § 841(b)(1)(B)(iii). Cf. Sanders, 470 F.3d at 624 ("[R]egardless of whether Sanders was convicted of 'robbery' or 'burglary' in 80CR421, the conviction would have counted as a predicate violent felony under the ACCA.").

Thus, the district court properly considered the 1997 felony drug conviction in enhancing Mr. Jones's sentence under 21 U.S.C. § 841(a)(1)(B)(iii).

## Conclusion

The judgment of the district court is affirmed.

**AFFIRMED**